Opinion of
 

 the Court.
 

 THIS is a writ of error to a judgment of the court of the United States for the district of Kentucky, rendered on a caveat, and is governed by the land laws of Virginia.
 

 
 *88
 
 In the year 1779 the legislature of that commonwealth opened a land office and offered for sale, with some reservations, so much of that tract of country lying within its boundaries south-east of the river Ohio as was then unappropriated: a part of which now constitutes the state of Kentucky.
 

 Every person who would pay at the rate of forty pounds for one hundred acres into the treasury of the state, became entitled to such quantity of waste and unappropriated land as was, at that rate, equivalent to the money paid, for which a certificate was given to the register of the land office, whose duty it was on receipt thereof, to issue a warrant for the quantity of land purchased, authorizing any surveyor, qualified according to law, to lay off and survey the same. A warrant might also be issued on certain other rights.
 

 A chief surveyor was appointed for each county, whose duty it was to nominate a sufficient number of deputies for the business of his county, and the law proceeded to direct that “ every person, having a land warrant founded “ on any of the before mentioned rights, and being de- “ sirous of locating the same on any particular waste and “ unappropriated lands, shall lodge such warrant with “ the chief surveyor of the county wherein the said lands “ or the greater part of them lie, who shall give a receipt “ for the same if required. The party shall direct the “ location thereof so specially and precisely as that others “ may be enabled with certainty to locate other warrants “ on the adjacent residuum; which location shall bear “ date on the day on which it shall be made, and shall be “ entered by the surveyor in a book to be kept for that “ purpose, in which there shall be left no blank leaves or
 
 “
 
 spaces between the different entries.”
 

 George Mason was one of the earliest purchasers under this law.
 

 On the 29th of April, 1780, he made the following entries:
 

 “ 1780, 29th April, George Mason enters 8,400 acres
 
 “
 
 of land to begin on Panther creek on the east side
 
 *89
 
 “ thereof, opposite to a beech on the west side about four “ miles above the mouth of the west fork, and to run up “ and down the said creek and eastwardly for quantity.”
 

 “ 1780, April 29th, George Mason enters 8,300 acres, “ to begin at the upper corner of his 8,400 acre entry, and " to run up the creek on the east side and back for quan- “ tity.”
 

 Panther creek pursues a general westwardly course from its source till it empties into Green river.
 

 The creek forks something more than twelve miles and one quarter of a mile in a straight line above its mouth; and one of those forks, the direction of which towards its source is northwardly, has, from the beginning of the year 1780, been generally termed the west fork, and the other has been termed Panther creek.
 

 On the 27th of October 1780, Mr. Mason made the following entry with the same surveyor:
 

 “ 1780, October the 27th, George Mason desires to “ make his entry of 8,400 acres, more special on Panther “ creek, viz. to begin four miles above the forks of Panther “ creek where it mouths into Green river on the east side “ running up and back for quantity.”
 

 In the months of September and October, 1783, these two entries of 8,400 and 8,300 acres were surveyed by James Hord, one of the deputy surveyors of the county of Jefferson, which surveys, as was the custom, were made conformably to the instructions given by Mr. Mason’s agent.
 

 The survey of the entry of 8,400 acres is supposed to conform to the explanation or amendment of that entry made in October, 1780. It begins four miles above the mouth of Panther creek and something more than eight miles below its forks.
 

 The survey of the 8,300 acre entry adjoins the survey of 8,400 acres on the upper side; and the plat was shown by the surveyor before he would return it to the then agent
 
 *90
 
 of Mr. Mason, who, after its supposed variance from the entry was suggested to him, approved it and directed it to be returned to the office.
 

 These surveys were returned in the course of the fall, 1783.
 

 The supposed variance between the survey and location of the 8,300 acres was afterwards, about the 12th of September, 1784, pointed out by the surveyor to a subsequent agent of Mr. Mason, who also approved of the manner in which the surveys were made, and returned them to the land office.
 

 On the 9th of April, 1783, George Wilson enters with the surveyor of Jefferson county 40,926 acres of land on Panther creek, so as entirely to include George Mason’s survey of 8,300 acres.
 

 This entry, though in the name of George Wilson, was made by John Handley, a deputy surveyor for Jefferson county, for his own benefit and that of Christopher Greenup, as well as for the benefit of George Wilson, and at the time of making the entry, full knowledge of the previous survey made of the same land for George Mason, had been obtained by the said Handley, who had seen the surveys in the office and had communicated this information to his two partners in the entry.
 

 In the month of March, 1784, George Wilson entered in the supreme court of the district of Kentucky a caveat to prevent a grant from issuing on George Mason’s survey of 8,300 acres, because the survey was made contrary to location, and because the entry was vague, he claiming the same, or so much thereof as interferes with his entry made on treasury warrants for 40,926 acres on the 9th of April, 1784.
 

 Pending the caveat George Mason departed this life, and the suit was revived against Richard Mason, devisee of the said George, at whose petition it was removed into the court of the United States, held for the district of Kentucky.
 

 
 *91
 
 A cross caveat was entered in the same court on the part of Richard Mason, to prevent the issuing a patent to George Wilson, and these causes coming on to be heard, it was agreed that the judgment rendered in the caveat Wilson v. Mason, should be also entered in the case of Mason v. Wilson.
 

 In June term 1800, the opinion of the court for the district of Kentucky was given that the defendant Mason had the better right, and it was ordered that the caveat entered by Wilson should be dismissed.
 

 To this judgment the plaintiff Wilson has obtained a writ of error, and the principal question now to be decided by this court is, which of the parties has the better right?
 

 But before entering on the question it may be necessary to notice a preliminary point made by the counsel for the defendant in error. He contends that in a caveat the decision of the district court is final, and that the cause cannot be carried before a superior tribunal.
 

 To maintain this proposition he relies on an act of the legislature of Virginia, making the judgments of the district courts of the state final in cases of caveat; and on the compact between Virginia and Kentucky, which stipulates that rights acquired under the commonwealth of Virginia shall be decided according to the then existing days.
 

 This argument would not appear to be well founded had Virginia and Kentucky even been for every purpose independent nations; because the compact must be considered as providing for the preservation of titles, not of the tribunals which should decide on those titles. But when their situation in regard to the United States is contemplated, the court cannot perceive how a doubt could have existed respecting this point. The constitution of the United States, to which the parties to this compact had assented, gave jurisdiction to the federal courts in controversies between citizens of different states. The same constitution vested in this court an appellate jurisdiction in all cases where original jurisdiction was given to the
 
 *92
 
 inferior courts, with only “ such exceptions and under “ such regulations as the congress shall make.” Congress, in pursuance to the constitution, has passed a law on the subject, in which the appellate jurisdiction of this court is described in general terms so as to comprehend this case, nor is there in that law any exception or regulation which would exclude the case of a caveat from its general provisions. If then the compact between Virginia and Kentucky was even susceptible of the construction contended for, that construction could only be maintained on the principle that the legislatures of any two states might, by agreement between themselves, annul the constitution of the United States.
 

 The jurisdiction of the court being perfectly clear, it remains to enquire which of the parties has the better right.
 

 The title of Mason being eldest is of course the best if it be not in itself defective.
 

 In the caveat of the plaintiff in error two defects in the title of the defendant are assigned.
 

 1st. That his entry is vague.
 

 2dly. That he has surveyed contrary to his location.
 

 The first was abandoned in argument, and does not appear to the court to have been maintainable.
 

 The second shall now be considered.
 

 To support the allegation that the survey has been made contary to the location, the entry and the survey are produced.
 

 The entry calls for a beginning on the upper corner of George Mason’s entry of 8,400 acres. To ascertain this spot reference must be had to the entry called for. That is to begin on Panther creek, on the east side thereof, opposite to a beech on the west side, about four miles above the mouth of the west fork, and to run up and down the said creek and eastwardly for quantity.
 

 
 *93
 
 The branch of Panther creek which was at the date of the entry generally denominated the west fork, is something more than twelve miles and one quarter of a mile above its mouth. The entry of 8,400 acres is to begin four miles above the west fork, and the land in controversy ought to be placed above that entry. Yet it is surveyed below the west fork.
 

 To obviate this difficulty the counsel for the defendant in error produces and relies upon the entry of October 27th, 1700.
 

 That entry is in these words:
 

 “
 
 George Mason desires to make his entry of 8,400 acres more special on Panther creek, viz. to begin four miles above the forks of Panther creek, where it mouths into Green river, on the east side, running up and back for quantity.”
 

 This entry is contended to be, not a removal, but an explanation of that which had been made on the 29th of April, 1780, and being merely an explanation, the survey of the land in controversy, beginning at the upper corner of the survey of the 8,400 acre tract, conforms to its original location, and is consequently free from the exception made to it.
 

 If this position be true, the entry of the 27th of October, 1780, must describe the same land with that which is described, though with less certainty, by the entry of the 29th of April in the same year.
 

 But the entry of the 29th of April, calls for a beginning four miles above the mouth of the west fork of Panther creek, which fork is more then twelve miles in a straight line above the mouth of the creek, and the subsequent entry begins four miles above the forks of Panther creek where it mouths into Green river. The west fork of Panther creek and the mouth of the same creek where it empties into the river are perfectly distinct and separate places and were so understood at the time this location was made.
 

 
 *94
 
 It is however contended that in the extensive wilderness offered for sale, accuracy of description was not to be expected, and the point of union between a creek and river might well be mistaken for the forks of a creek.
 

 This would not be very probable in any case, but is totally inadmissible in this, because names of places which they were generally understood to possess have been used by the person locating for Mr. Mason, and as there are no other controlling boundaries referred to, they must be understood as designating the water courses which were commonly described by those names, and which any person inclined to locate the adjacent residuum, would necessarily suppose to have been referred to by them.
 

 But if the location of October explains without removing that of April, then the original entry might without such explanation, have been there surveyed, and could not have been properly surveyed four miles above the west fork.
 

 This would scarcely have been attempted.
 

 Indeed the counsel for the appellee, in admitting that an entry made on the land in controversy, subsequent to Mason’s entry, but before his survey, would have been good, seems to have disclosed an opinion that the original entry did not comprehend the land in question, and that not the entry, but the survey is to be relied on as the foundation of his title.
 

 To the court it appears perfectly clear, that the entry of the 27th of October was a removal and not an explanation, of that of the 29th of April.
 

 It has not been contended that the removal of the 8,400 acre entry has also removed that of 8,300 acres.
 

 The title of Mason then if good, must be shewn to be so by establishing that a survey without an entry is a sufficient foundation for a title.
 

 With a view to discover whether this question has been settled in Kentucky all the adjudications contained in the
 
 *95
 
 book of reports furnished by the counsel for the plaintiff in error, have been examined. It is not perceived either that the question has been directly determined, or that any principles have been settled which govern it.
 

 This case then is of the first impression.
 

 The act of the Virginia legislature must be expounded according to the opinion this court may entertain of its import, without deriving any aid from the decisions of the state tribunals.
 

 In 1779, Virginia opened a land office for the sale of an extensive unsettled and almost unexplored country, the motives for which are stated in the preamble of the statute to have been,
 
 “
 
 to encourage the migration of foreigners, promote population, increase the annual revenue, and create a fund for discharging the public debt.”
 

 Any person whatever might become a purchaser of any portion of these lands by paying into the treasury of the commonwealth the purchase money required by law. By doing so he became intitled to a warrant authorizing any surveyor to lay off for him in one or more surveys the quantity of land purchased. It was apparently contemplated by the law that the number of purchasers would immediately become very considerable. The condition of these purchasers in this stage of the contract ought to be distinctly understood. They had acquired a right each to appropriate to himself so much of the vacant land belonging to the commonwealth as he had purchased, but no right either in common or severally, to the whole or any particular part of the country, until such right should be acquired by further measures.
 

 This was at the same time the situation of a great number of persons, and a prior was in no respect more eligibly circumstanced than a subsequent purchaser, except in the single case of both applying precisely at the same time, for the purpose of appropriating each to himself the same land. Had the purchaser of the first warrant been negligent enough to hold it up until the whole land was appropriated, the title of every subsequent purchaser would have been good against him, and he would have been
 
 *96
 
 without remedy. The original purchase of a warrant then creating only a general claim which gave of itself only in a single case priority of right to the prior purchaser, it became indispensably necessary to prescribe a mode by which this general title should be satisfied by the appropriation of a particular tract of land.
 

 This mode seems to have been prescribed by that part of the act which says that “ every person having a land “ warrant and being desirous of locating the same on any “ particular waste and unappropriated lands,
 
 shall
 
 lodge “ such warrant with the surveyor of the country wherein “ the lands or the greater part of them lie.”
 
 “
 
 The party “ shall direct the location thereof so specially and pre- “ cisely that others may be enabled
 
 with certainty,
 
 to lo- “ cate other warrants on the adjacent residuum; which “ location shall bear date the day on which it shall be “ made, and shall be entered by the surveyor in a book “ to be kept for that purpose.”
 

 This mode of appropriation pointed out by the law as that which must be used by any person desirous of locating a warrant on any particular waste and unappropriated land, requires that the location shall be given to the surveyor with the warrant, in order to be entered in a book kept for that purpose, which is denominated the book of entries.
 

 It is apparent throughout the whole act that the legislature never contemplated a survey as being in itself an appropriation of land, or supposed that one would be ever made, if not founded on a previous entry.
 

 Some few of the many passages which are found in various parts of the law will be selected to evince this position.
 

 The surveyor is forbidden to admit the entry of any warrant on treasury rights, except pre-emption warrants, in his books before the first day of May next succeeding the passage of the act. But the prohibition does not extend to a survey, and yet this would have been equally necessary if land could have been appropriated by a survey without a previous location.
 

 
 *97
 
 It is declared that no entry or location shall be admitted for certain lands which are described in the act and intended to be reserved: But there is no declaration that they shall not be surveyed. This omission manifests an opinion that they could not be appropriated by survey alone.
 

 In prescribing the duty of a surveyor the law enjoins him to proceed with all practicable dispatch to survey all lands entered in his office; and many rules are given to regulate the suveying of entries; but there is not a syllable in the act which contemplates or makes a single provision for surveys not founded on a prior entry made in the book of entries.
 

 The mode of appropriation then which the law designates has not been pursued, but it is contended that another course has been adopted which equally produces all the objects designed to be effected by the location in the book of entries, and which therefore ought to be received as a sufficient substitute for an entry.
 

 The legislature of Virginia, when bringing her lands into the market, had undoubtedly a right to prescribe the terms on which she would sell, and the mode to be pursued by purchasers for the purpose of particularising the general title acquired by obtaining a land warrant. The court is by no means satisfied of its power to substitute any equivalent act for that required by the law.
 

 The case of Blackwell v. Harper, reported in 2. Atkyns, 93, has been cited to show the authority of a court to dispense with part of a statute directing the mode of proceeding to be observed by a person who claims title under such statute.
 

 That case arose under an act of parliament which directs that “ any person who shall invent, or design, engrave, &c. any historical or other print or prints, shall have the sole right and liberty of printing and re-printing the same for the term of fourteen years, to commence from the day of the first publishing thereof, which shall be truly engraved with the name of the proprietor on each plate, and printed on every such print or prints.”
 
 *98
 
 The plaintiff had engraved certain medicinal plants, a work deemed within the act, and had brought a bill to establish her right to the sole property in them, and to restrain the defendant from copying and engraving them, upon the penalties within the act of parliament.
 

 It was objected that the day of publication from which the term was to commence had not been engraved, and so the act had not been complied with and consequently the property had not vested.
 

 Lord Hardwicke was of opinion that the property vested, although the day of publication was not engraved, and that the words directing the day of publication to be engraved on each print were only necessary to make the penalties incur, not to give the title.
 

 “ Here,” said his lordship, “ the clause which vests the property is distinct.”
 

 This opinion however was given with great doubt, and only an injunction was granted without costs and without an order for an account.
 

 The case of Blackwell v. Harper has, at the bar, been denied to be law. However this may be, it is certainly essentially variant from that before the court.
 

 The opinion of lord Hardwicke was not that where any circumstance was required by a statute in order to vest a title, other equivalent acts might be received as a substitute; but that the particular statute on which the case depended, did not require the omitted circumstance, since the property was vested by a distinct clause.
 

 By a reference to the words themselves, it will be perceived that the expression of the act of parliament is such as might perhaps warrant this opinion. The property is completely vested before the direction concerning the date of the publication is given, and lord Hardwicke supposes it to be a question on which judges would differ whether the subsequent words were merely directory or descriptive. A perfect property in the specific thing was supposed by that judge to have been given by other words, and on that idea his decree is declared to have been formed.
 

 
 *99
 
 But in the case under consideration no property in the specific thing is supposed to have been given by other words. No title to it is created by any other part of the act. The purchase of the land warrant gave a power to appropriate, but was no appropriation, and the mode pointed out by the legislature would seem to the court to be that, which can alone give title to the particular lands.
 

 But if this opinion should even be too strict, if an act entirely equivalent to an entry could be received as a substitute for one, a survey does not appear to be such an act, nor does it seem to have been so considered by the legislature.
 

 From the circumstances under which the act for establishing the land office was passed, as well as from the expressions of that act, it is apparent that the entry was intended to give complete notice to other purchasers that the land located was already appropriated. The mode of giving this notice it was certainly proper to prescribe. By doing so, the numerous doubts and questions concerning the sufficiency of notice, which would inevitably arise from leaving that important fact to the discretion of individuals, in the first instance, and then to the discretion of courts to be exercised many years after all the lands should be located, would be in a considerable degree obviated.
 

 It was doubtless an important object to obviate them.
 

 The regulations therefore respecting entries are all calculated to make them as notorious as possible.—Not so of surveys.
 

 The entries and surveys are to be kept in separate books. Why so if a survey amounted to an entry?
 

 The entry must be dated when made by the locator; but the time of recording a survey may appear or not at the discretion of the surveyor, and a subsequent survey may be recorded before one of prior date.
 

 There are to be no blanks in the book of entries, and this regulation is well calculated for the prevention of
 
 *100
 
 frauds in the origin of titles. It does not apply to the book of surveys.
 

 The book of entries is open to the inspection of every person. The book of surveys cannot be looked into but at the discretion of the surveyor.
 

 If a prior entry be alleged the person affected thereby has a right to demand a copy thereof; but no copy of a survey can be given to any other than the proprietor until twelve months after it shall have been made.
 

 From the whole act a legislative intention to make an entry, and an entry only, the foundation of title to any particular tract of land is strongly to be inferred, and if even an equivalent act could be received, a survey does not appear to be such an act. In this particular case it is true that complete notice was obtained by it, but titles must rest on general principles, and in the general, a survey would not, without something more than the law requires, be notice. The law, therefore, can not contemplate a survey as of equal operation with an entry.
 

 A question has been made at the bar, whether a caveat is in the nature of an equitable action, and on the supposition that it is of that nature, the counsel for the defendant in error has insisted that Wilson, having express notice of Mason’s survey was unable to acquire title to the land appropriated by that survey.
 

 This would be true if the survey gave to Mason any title either in law or equity. But if a survey without an entry was no appropriation—if it gave no title—then notice of the survey could not create a title.
 

 The doctrine of notice is well established. He who acquires a legal title, having notice of the prior equity of another, becomes a trustee for that other to the extent of his equity But if he has no equity, then there is nothing for which the purchaser of the legal estate can be a trustee.
 

 A point in the case still remains which appears more doubtful, and concerning which very considerable difficulties have been felt.
 

 
 *101
 
 Although Mason’s survey may give him no title, it is questioned whether Wilson can maintain a caveat against it.
 

 The caveat is a remedy given to prevent a patent from issuing in certain cases where the directions of the law have been violated to the injury of the commonwealth, or where some other person hath a better right. The case before the court is that of a better right. The terms in which this remedy is accorded to the person who would avail himself of it for the purpose of asserting his own title are, “or if any person shall obtain a survey of lands “to which another hath by law a better right, the person “having such better right may in like manner enter a ca- “ veat,” &c.
 

 Considerable doubts were entertained whether the word
 
 “ hath,”
 
 in the description of the character by whom a caveat might be maintained, did not absolutely require that the better right should exist at the time the survey should be obtained. This construction, to which some of the court were at first greatly inclined, would have involved considerable inconvenience, and would have defeated what is deemed the essential object for which the remedy was given.
 

 It has been already stated to be the opinion of the court, that a survey not founded on an entry is a void act and constitutes no title whatever. Consequently the land so surveyed remains vacant and liable to be appropriated by any person holding a land warrant. It is difficult to conceive that a remedy designed to enable an individual who has made his entry in conformity with the law, to prevent another from obtaining a grant for the land he has entered, should be withheld from any person whose entry entitles him to the land he has located. It is not less difficult to impute to the legislature an intention to protect a survey to which the law denies all power of appropriating the land it comprehends, or an intention of carrying such survey into grant, while another has legally appropriated to himself the land thus to be granted. It would be difficult to state a case to which the principle, that a remedy should be so extended as to meet the mischief, would apply more forcibly than to this. If however the
 
 *102
 
 terms of the law had been explicit, those terms must have controlled the subject. But the expression of the act is not if any person shall obtain a survey to which another at the time such survey may be obtained shall have by law a better right, the person having such better right may enter a caveat, &c. The words of the law are not thus express. They are, if any person shall obtain a survey of land to which another
 
 hath
 
 by law a better right. The word
 
 hath
 
 in its most strict and rigid sense would refer neither to the time of making the survey, nor or of entering the caveat, but to the present moment when the word is used, and would require that the better right should exist at the time of the passage of the act. This construction would be universally rejected as absurd, and all would expect the court to understand the words more liberally, and to expound them so as to give some effect to the legislative will. Some latitude of construction then must be used, some words additional to those used by the legislature must be understood, and this being apparent, the court perceive no sufficient motive for extending the remedy to rights existing when the survey shall be made, and denying it to those which are equally valid and which exist when the caveat may be entered.
 

 The caveat entered by Wilson is therefore maintainable under the land law of Virginia, since his title had accrued when it was entered.
 

 The court is of opinion that the district court of Kentucky has erred in deciding that the defendant in error hath the better right, and that their judgment ought to be reversed and annulled. In pursuance of this opinion I am directed to deliver the following judgment.
 

 Judgment of the court.
 

 “ Whereupon, it is considered by the court that the plain- “ tiff Wilson hath by law the better right to the land in “ controversy, and that the judgment of the court of the “ United States for the district of Kentucky be reversed “ and annulled; and that the register of the land office in “ Kentucky do issue a grant to the said Wilson upon his “ survey of 30,000 acres of land registered in the said “ office, according to the metes and bounds thereof, and
 
 *103
 
 “ that the said plaintiff do also recover his costs expended “ in this court and in the said district court, all which “ is ordered to be certified to the said district court, and “ the said register of the land office accordingly.”
 

 In the case of Mason v.
 
 Wilson, the judgment of the court was, “ that the defendant Wilson hath by law the better “ right to the land in controversy, and that the judgment “ of the court of the United States for the district of “ Kentucky be reversed and annulled; and that the said “ caveat be dismissed, and that the defendant Wilson reco- “ ver his costs,
 
 &c.”
 

 *
 

 *
 

 As
 
 to the neccessity of giving notice in the form prescribed by law, vide
 
 Evans’s Essay an bills,
 
 67. 68. 69. 70.
 
 71.—and 2. H. Bl.
 
 609.
 
 Nicholson
 
 v.
 
 Gouthit.