## THOMAS SIMS'S CASE.

When it appears, from a petition for a writ of *habeas corpus*, that the petitioner, if brought before the court, would not be entitled to a discharge, the writ will not be issued.

How far it is competent for one court, by a writ of *habeas corpus* to the executive officer of another court, to take a prisoner from the custody of the latter, *quære.*

Congress has power, under the constitution of the United States, to pass laws for the reclamation of fugitive slaves.

The act of congress of 1850, *c.* 60, concerning fugitives from service, being substantially like the act of congress of 1793, *c.* 7, the constitutionality of which has been settled by the decisions of the courts of the United States, must be deemed constitutional by this court. The authority which it confers on commissioners of the circuit courts, and its making no provision for a trial by jury, do not make it unconstitutional.

THIS was a petition for a writ of *habeas corpus.* *S. E. Sewall*, on the 4th of April, 1851, presented to this court the

petition of Thomas Sims, describing himself as of Boston, and representing that he was imprisoned at the court house in Boston, by Charles Devens, of said Boston, Esquire; that Devens pretended that the petitioner was a fugitive slave, and imprisoned him on that ground, and pretended to hold him by virtue of a warrant, a copy * of which, and of the return of the officer thereon, was annexed to the petition; that Devens was the marshal of the United States for the district of Massachusetts, and that Frederick D. Byrnes, whose name was subscribed to said copy, was one of his deputies, and in executing the warrant, acted under his authority and direc-

---

* This copy was in the following words:

"*United States of America, Massachusetts District*, ss.

" [SEAL.]    To the marshal of our District of Massachusetts, or to either of his Deputies, Greeting:

"In the name of the President of the United States of America, you are hereby commanded forthwith to apprehend Thomas Sims, now alleged to be in your district, a colored person, charged with being a fugitive from labor, and with having escaped from service in the State of Georgia, (if he may be found in your precinct,) and have him forthwith before me, one of the commissioners of the Circuit Court of the United States for the said district, at the court house in Boston, in the said district, then and there to answer to the complaint of John B. Bacon, of the city of Savannah, in the state of Georgia, agent and attorney of James Potter, of the county of Chatham, in the state aforesaid, alleging under oath that the said Thomas Sims owes service or labor to the said Potter, in the state of Georgia, and while held to service there, under the laws of the said state of Georgia, escaped into the state of Massachusetts aforesaid, and praying for the restoration of the said Thomas Sims to the said Potter, and then and there, before me, to be dealt with according to law.  Hereof fail not, and make due return of this writ, with your doings thereon before me.  Witness my hand and seal, at Boston aforesaid, this third day of April, in the year one thousand eight hundred and fifty one.

" GEO. T. CURTIS,
" Commissioner of the Circuit Court of the United States
for the Massachusetts District."

"*United States of America, Massachusetts District*, ss.
" Boston, April 3, 1851.

"Pursuant hereunto, I have arrested the within named Thomas Sims, and now have him before the commissioner within named for examination.

" A true copy.                            FREDERICK D. BYRNES,
" Attest,                                U. S. Deputy Marshal.
"FREDERICK D. BYRNES,
."U. S. Deputy Marshal."

tion. Wherefore, the petitioner prayed this court to issue a writ of *habeas corpus*, to have him brought before them and discharged from his imprisonment. And the petitioner further said that he was free, and not a slave. The petition was signed with the petitioner's mark, and sworn to by him.

*Sewall* spoke briefly in favor of issuing a writ of *habeas corpus*. But the court refused to grant the writ, on the ground that no sufficient cause for granting it was shown in the petition.

On the 7th of April, *R. Rantoul, Jr.* and *R. H. Dana, Jr* presented a similar petition.

*R. H. Dana, Jr.*, for the petitioner, referred to Rev. Sts. *c.* 111, §§ 1, 2, and contended that, as it appeared from the petition that this case was not within either of the exceptions enumerated in § 2, the petitioner was entitled to the writ as of right, and to have the unlawfulness of his imprisonment tried upon the return. But the court directed the whole case to be argued now.

*R. Rantoul, Jr.*, for the petitioner. 1. The power which the commissioner is called upon in this proceeding to exercise is a judicial power, and one which, if otherwise lawful, can be exercised only by a judge of the United States, duly appointed; and the commissioner is not such a judge. He has therefore no jurisdiction of this case, and this court should order the petitioner to be discharged. Opinion of Tilghman, C. J., *Commonwealth* v. *Smith*, 5 American Register, 168, 171.

The constitution of the United States provides, in art. 3, § 1, that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and establish. The judges both of the supreme and inferior courts shall hold their offices during good behavior, and shall at stated times receive for their services a compensation which shall not be diminished during their continuance in office." The power here given is the whole judicial power of the United States; and congress has no authority to confer any portion of judicial power on any other persons. *Martin* v. *Hunter*, 1 Wheat 304, 327, 330.

A commissioner is not a judge within the meaning of the constitution, for he is not appointed to hold his office during good behavior, but at the pleasure of the circuit court of the United States; and he does not receive a compensation for his services at stated times, but is paid by fees, the amount of which depends on his decision — being ten dollars if he decides for the claimant, and five if he does not. Act of 1850, c. 60, § 8. The commissioner cannot, therefore, exercise judicial power.

Now, are the duties of the commissioner, under this act, an exercise of judicial power? The constitution of the United States, in art. 3, § 2, provides that "the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and the treaties made, or which shall be made, under their authority. See, on the construction of this clause, *Cohens* v. *Virginia*, 6 Wheat. 264, 379, 407; *Parsons* v. *Bedford*, 3 Pet. 433, 446. The proceedings, provided for by the act of 1850, of themselves constitute a case within the meaning of this clause. Any proceeding whereby a party invokes the aid of any tribunal to render him any right, which he demands, and which is denied or withheld from him, constitutes a case. "Where a claim is made by the owner, out of possession, for the delivery of a slave, it must be made, if at all, against some other person; and inasmuch as the right is a right of property, capable of being recognized and asserted by proceedings before a court of justice, between parties adverse to each other, it constitutes, in the strictest sense, a controversy between the parties, and a case 'arising under the constitution' of the United States, within the express delegation of judicial power given by that instrument." By Story, J., delivering the opinion of the supreme court of the United States, in *Prigg* v. *Pennsylvania*, 16 Pet. 539, 616.

The act of 1850, c. 60, § 6, calls this proceeding "a case," and directs the commissioner to "hear and determine" it; and his certificate, when granted, is conclusive, and the claimant can take away the captive wherever he pleases. And § 4 gives the commissioner concurrent jurisdiction with the

judges of the circuit and district courts of the United States. Attorney General Crittenden, in his opinion, given to the president on the constitutionality of this law in another respect, says, that § 6 " provides that those officers, and each of them, shall have *judicial power* and jurisdiction to hear, examine and decide *the case.*" [5 Opinions of Att. Gen. of U. S. 255.]

The decision of the commissioner is conclusive of the fact, that the person claimed owes service to the claimant. As Attorney General Crittenden says, " Congress has constituted a tribunal, with exclusive jurisdiction to determine summarily, and without appeal, who are fugitives from service or labor, and to whom such service or labor is due." [5 Opinions of Att. Gen. of U. S. 258.]

If this be not so ; if the commissioner be not required to decide this question, but only whether the alleged fugitive shall be taken back to the state from which he is alleged to . have fled, the act is yet more grossly unconstitutional ; for art. 4, § 2, of the constitution only authorizes a " person *held* to service or labor" to be delivered up ; not one merely *charged*, or *claimed*. By contrasting this with the preceding paragraph, concerning fugitives from justice, the difference between the two cases appears clearly. That paragraph provides, that " a person *charged* in any state with treason, felony or other crime, who shall flee from justice," shall be delivered up ; and the reason is, that he may be tried by a jury of the vicinage in which the crime is said to have been committed. A *primâ facie* case is all that is required in the case of a fugitive from justice. But it is not all in the case of an alleged fugitive from service, who is the inhabitant of a free state. He is here presumed to be free. Declaration of Rights, art. 1. And the constitution of the United States does not allow him to be given up, to be carried thousands of miles from his home and friends, to be tried, if tried at all, in a state where all the presumptions of law and fact are against him on account of his color ; and with no security that he will be able to obtain a trial.

If the act requires that the alleged fugitive from service shall be sent back, without finding out whether or not he be

actually *held* to service under the laws of another state, the act is unconstitutional, because there is no power given to congress by the constitution to pass such an act. Congress, if it has any power in the premises, can only pass an act declaring that the person *held* shall be delivered up. If congress undertakes to do more, its acts are void. On the other hand, if it is first to be ascertained whether or not the party claimed be really held to service, then the decision of the commissioner is final on this question ; his decree is the last act of judicial power, which power the commissioner has no authority, under the constitution, to exercise, not having the unchangeable salary or the permanent tenure of office, without which no man can constitutionally be made a judge.

2. Congress has no power, under the constitution of the United States, to legislate at all on the subject of fugitive slaves. The government of the United States is a government of limited powers. It has no powers that are not expressly delegated to it by the constitution. The powers not expressly delegated to it, are reserved to the states respectively, or to the people. Const. of U. S. Amendments, art. 10 ; Declaration of Rights, art. 4. The force of this argument, as applied to the subject of fugitive slaves, will better appear by an examination of the previous clauses of the fourth article of the constitution.

The first section of that article provides that " full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state." These words, of themselves, only declare what shall be done; they are no grant of power to congress ; and, therefore, the framers of the constitution added : "And the congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof."

The first paragraph of the second section of the same article declares that the " citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." This is a direction to the states, and to no one else. There is no power given to congress to act, as there is in the first section ; and congress has never acted on any such supposed power.

Then comes the second paragraph : "A person charged in any state with treason, felony or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime." This clause does not necessarily imply that it must be executed by congress ; for it can be executed by the states. The duty enjoined by it is now performed by the states, though regulated by a federal law. But a state might make regulations on the subject, as well as congress. And the constitution declares, that what is not expressly delegated to the general government is reserved. Therefore congress has no power to legislate on the subject of fugitives from justice.

But the objection is still stronger, as applied to the third paragraph, which is the one now in question. So far from any power being granted to congress, direct reference is made to the states. " No person held to service or labor in *one state*, under the laws thereof, escaping into *another*, shall, in consequence of any law or regulation *therein*, be discharged from such service or labor ; but shall be delivered up, on claim of the party to whom such service or labor may be due." The prohibition, in its form, as well as from its nature, is directed to the states only ; and so is the command to deliver up. This clause stands precisely as the first section would have stood, if no power had been expressly granted therein to congress.

The opinion of the court was delivered on the afternoon of the same day by

SHAW, C. J. This is a petition for a writ of *habeas corpus* to bring the petitioner before this court, with a view to his discharge from imprisonment, upon the grounds stated in the petition. We were strongly urged to issue the writ, without inquiry into its cause, and to hear an argument upon the petitioner's right to a discharge, on the return of the writ. This we declined to do, on grounds of principle, and common and well settled practice. Before a writ of *habeas corpus* is granted, sufficient probable cause must be shown ; but when it appears upon the party's own showing that there is no sufficient

ground *primâ facie* for his discharge, the court will not issue the writ. And on a slight recurrence to the cases, we are of opinion that this is the established rule and practice at common law. Indeed the ordinary course is, for the court applied to, to grant a rule *nisi* in the first instance to show cause why the writ should not issue. Of course, if sufficient cause is shown, it will be withheld. *Blake's case*, 2 M. & S. 428 ; *The King* v. *Marsh*, 3 Bulst. 27. And in *Hobhouse's case*, 3 B. & Ald. 420, the question came before the court and was fully discussed. It was there considered that, whether the writ of *habeas corpus* were claimed at common law or under the statute, a proper ground ought to be laid before the court, previously to granting the writ. It is not granted as a matter of course ; and the court will not grant the writ of *habeas corpus* when they see that, in the result, they must remand the party. The court in that case, which was a commitment by the house of commons, had granted the writ, in the first instance, upon an urgent claim that it was a matter of right, and some colorable authority cited in support of it, and on its return stated the reasons why it should not have been done.

We think that the same rule and practice have prevailed in this country. In *Watkins's case*, 3 Pet. 201, Marshall, C. J., said, " the writ ought not to be awarded, if the court is satisfied that the prisoner would be remanded." Indeed, by necessary implication, it is the fair result of the provisions of the *habeas corpus* act of this commonwealth. The Rev. Sts. *c.* 111, § 3, require, in all cases of an application for the writ of *habeas corpus*, that the party imprisoned, or some person in his behalf, shall present a petition, and if held under legal process, or color or pretence of legal process, shall annex a copy of the process, under which the respondent claims to hold and detain him, or make proof by affidavit, that a copy of such a writ or warrant has been applied for, and refused. But why annex a copy of the process, unless it be to enable the court to form an opinion whether the party is rightly held in custody or not; and why form an opinion in that stage of the proceeding, if it is to constitute no ground for judicial action ? It is urged that this is a writ of right, and therefore grantable without inquiry. But it

is not a writ of right in that narrow and technical sense; if it were, the issuing of it would be a mere ministerial act, and the party claiming it might go to the clerk and sue it out, as he may a writ on a claim for land or money. It is a writ of right in a larger and more liberal sense; a right to be delivered from all unlawful imprisonment. Nor does this limit or restrain the full and beneficial operation of this writ, so essential to the protection of personal liberty. The same court must decide whether the imprisonment complained of is illegal; and whether the inquiry is had, in the first instance, on the application, or subsequently, on the return of the writ, or partly on the one, and partly on the other, it must depend on the same facts and principles, and be governed by the same rule of law. It was upon these grounds, that we stated on the presentation of a similar petition, that no sufficient cause appeared upon the petition for granting a writ; and upon further consideration we now repeat, that when it appears on the party's own showing in the petition, that if brought before the court, he would not be entitled to a discharge, the court will not issue the writ.

We are then to examine the petition, accompanied as it is, by a copy of the warrant under which the marshal of the district claims to hold the petitioner, and the return thereon. It appears that the petitioner has been arrested and is claimed as a fugitive from labor, upon a warrant, issued by George T. Curtis, Esquire, a commissioner of the circuit court of the United States, in pursuance of a law of the United States, and that the deputy marshal has returned the warrant to the commissioner who issued it, and has the body of the petitioner before the commissioner for the purposes expressed in the warrant. .

An obvious question occurs here, namely, how far it is competent for this court, by a writ of *habeas corpus* to the marshal, to take a prisoner from the custody of another tribunal, court or magistrate, of which the marshal is the executive officer, and after the prisoner has, by the execution and return of the warrant, been placed under the control and direction of such court or magistrate, to be held, discharged, brought in, or

25 *

remanded.   This point has not been noticed in the argument, and is not, perhaps of much importance; and perhaps it might be avoided by an amendment of the petition.   But we have thought it worthy of a passing remark, as one of those considerations which presented themselves to our minds after a similar petition had been submitted on a former occasion, indicating that apparently, and on the face of the proceedings, the petitioner was in regular and lawful custody.

It is now argued, that the whole proceeding, as it appears upon the warrant and return, is unconstitutional and void; because, although the act of congress of 1850, *c.* 60, (9 U. S. Stat. at Large, 462,) has provided for, and directed this course of proceeding, yet that the statute itself is void, because congress had no power, by the constitution of the United States, to pass such a law, and confer such an authority.   The ground of argument leading to this conclusion is, that it is not competent for congress, under the power of legislation vested in them by the constitution, to confer any authority, in its nature judicial, upon any persons, magistrates or boards, other than organized courts of justice, held by judges, appointed as such, and to hold their offices during good behavior, and paid by fixed salaries; whereas the commissioners, designated by the law in question, do not hold their offices during good behavior, nor are they paid by fixed salaries.   This is the argument.

We are called on to consider two questions : First, whether congress has authority to pass any law on the subject; and second, whether the law actually passed did, in any respect, of which the petitioner had a right to complain, violate the provisions of the constitution.   These are grave questions, and it is impossible to approach them without a deep sense of the responsibility which must rest on a judicial tribunal, when called upon to deliberate upon the constitutionality of any legal enactment adopted by the highest legislative body of the union, and passed under all the forms required to give it the sanction of law.

The subject matter of this act is the return and restoration of fugitive slaves, designated in the constitution as persons held to service or labor in one state under the laws thereof.

escaping into another. The whole provision, art. 4, § 2, is as follows: "No person held to service or labor in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due."

In order to a just understanding and exposition of this provision of the constitution, and the laws made under it, it is necessary to refer briefly to the circumstances under which the constitution was made, and the great social and political objects and purposes, which the people of the United States had in view, in adopting it. The constitution of the United States is not to be expounded as if it were now opened for the first time, and with a sole regard to the words and figures in which it is expressed; its history is too deeply interwoven with our whole social system, to be disregarded, when we are called upon to ascertain its full meaning and effect.

These North American provinces, when they became independent of the government of Great Britain, regarded themselves, and were regarded, as sovereign states; the articles of confederation were considered rather as a compact amongst independent states, than as a government. While pressed by the force of a common external hostility, by which England attempted to subdue them to obedience, a sense of common danger and common interest, and the necessity of acting together in their common defence, compelled them to act together with a good degree of harmony and union; but this could last only while this external pressure continued. When it terminated, what was the condition of these independent communities? That of sovereign states, varying greatly in regard to extent of territory, numbers and strength, with the usual powers incident to sovereign states, of declaring war and peace, making treaties, and exercising an exclusive control and jurisdiction over all persons and subjects within their respective territories. These would have been their rights and powers, had no union been formed.

In some of the states, large numbers of slaves were held; in others a few only; but some, it is believed, in all, except

Massachusetts, in which slavery was considered as abolished, by the Declaration of Rights, adopted as part of the constitution of 1780. Had no union been formed, the states would have been left to assert and defend their rights against each other by war only. If two states bordered on each other, one a slave state and the other a free state, there would of course be a constant effort of slaves to escape into the free state, and a constant temptation to slave owners to follow and recapture them, which must be done by force, unless sanctioned by treaty. Such acts on both sides must be regarded by each as violations of the exclusive territorial rights of the other, and a justifiable cause of war. There would naturally be a constant border war, leading either to interminable hostility, or to the subjugation of one by the other. This state of things could only be avoided by a treaty, by which one party should stipulate not to permit its own territory to be used as an asylum for fugitive slaves escaping from the other, and the other party should engage to restrain its own subjects from making hostile incursions into the territory of the other. It would be in vain for the government of the free state to insist that they would enter into no such compact, because slavery is wrong and unjust; each sovereign power has a right, by the recognized law of nations, to decide for itself, upon its own internal condition and regulations, within its own territory. This principle has been acknowledged by all nations, even those to whose policy, laws and institutions, slavery is most obnoxious. If the refusal to enter into such treaty could have abolished slavery in a slave state, it might have been a motive with a free state to refuse. But it is manifest that it would not, except by war and conquest, depending not upon a principle of right, justice or policy, but upon the preponderance of physical force.

The evils existing immediately before the adoption of the constitution, and the greater and more appalling evils in prospect, indicated the absolute necessity of forming a more perfect union, in order to secure the peace and prosperity of all the states. This could only be done by the several states renouncing and relinquishing a portion of their powers of sov

reignty ; and these were the right of war and peace, the right of making treaties with foreign powers and with each other, and the right of exercising absolute power and dominion over all persons and things within their own territories respectively. In order to form this more perfect union, delegates from the several states met together.    It was obvious that the renunciation of some of the powers of sovereignty, at least to the extent above mentioned, was the first step to be taken, and was absolutely essential to the success of any scheme of union. Still, it could not but be perceived that the great difference in the condition of the states in regard to the institution of slavery, and the prospect that many of the states would soon become free, from causes then in operation, constituted a difference in their relative condition, which must first be provided for.. So long as the states remained sovereign, they could assert their rights in regard to fugitive slaves by war or treaty, and, therefore, before renouncing and surrendering such sovereignty, some substitute, in the nature of a treaty or compact, must necessarily be devised and agreed to.    The clause above cited from the constitution seems to have been, in character, precisely such a treaty.    It was a solemn compact, entered into by the delegates of states then sovereign and independent, and free to remain so, on great deliberation, and on the highest considerations of justice and policy, and reciprocal benefit, and in order to secure the peace and prosperity of all the states.    It carries with it, therefore, all the sanction which can belong to it, either as an international or a social compact, made by parties invested with full powers to deliberate and act; or as a fundamental law, agreed on as the basis of a government, irrepealable, and to be changed only by the power that made it, in the form prescribed by it.

Such being the circumstances, under which this provision of the constitution was adopted ; such the relations of the several states to each other; such the manifest object which the framers of the constitution had in view ; we are to look at the clause in question, to ascertain its true meaning and effect. We think it was intended to guaranty to the owner of a slave, living within the territory of a state in which slavery is

permitted, the rights conferred upon such owner, by the laws of such state; and that no state should make its own territory an asylum and sanctuary for fugitive slaves, by any law or regulation, by which a slave, who had escaped from a state where he owed labor or service into such state or territory, should avoid being reclaimed; it was designed also to provide a practicable and peaceable mode, by which such fugitive, upon the claim of the person to whom such labor or service should be due, might be delivered up.

But the right, thus secured by the constitution to the slave owner, is limited by it, and cannot be extended, by implication or construction, a line beyond the precise *casus fœderis.* The fugitive must not only owe service or labor in another state, but he must have *escaped* from it. This is the extent of the right of the master. It is founded in the compact, and limited by the compact. It has therefore been held, that if a slave is brought into this state by his master, or comes here in the course of his occupation or employment without having *escaped,* he is not within the case provided for by the constitution. *Commonwealth* v. *Aves,* 18 Pick. 193. This results not so much from the voluntary act of the master in bringing or permitting the slave to be brought within the limits of a free state, as because the law by which the person is held to slavery in his own state is local, and has no extraterritorial operation, and because he is not within the provision of the constitution, under which he may be lawfully removed, not having escaped.

Upon the same principle it was held, on the return of a writ of *habeas corpus* before me in vacation, that a person who was a slave in Virginia, belonging to an officer of the navy, and who had been taken out by such officer by the special permission of the secretary of the navy, and where the ship had been ordered to Boston on her return from a cruise, and the crew to be discharged there, could not be taken back to Virginia by force and against his will; because the master had no power to imprison him within the limits of this state, or remove him by force from them, under his general authority as an owner by the law of Virginia; and that he was not liable

to be claimed as a fugitive, under the provision of the constitution, because he had not *escaped*. *Commonwealth* v. *Fitzgerald,* 7 Law Reporter, 379.

To the extent, however, to which this privilege or benefit goes, that of securing the return of persons, owing service or labor in one state, who have fled and escaped into another, this provision of the constitution must be regarded as complete and sufficient to the proposed right. But the constitution itself did not profess or propose to direct, in detail, how the rights, privileges, benefits and immunities, intended to be declared and secured by it, should be practically carried into effect; this was left to be done by laws to be passed by the legislature, and applied by the judiciary, for the establishment of which full provision was at the same time made. The constitution contemplated a division and distribution of the powers incident to a sovereign state, between the general government of the United States, and the government of each particular state; a distribution, not depending on local limits, but made by selecting certain subjects of common interest, and placing them under the entire and exclusive jurisdiction of the general government; such, for instance, as the foreign relations of the country, the subjects of war and peace, treaties, the regulation of commerce with foreign nations, and among the several states, and with the Indian tribes. These are a few of the most prominent subjects, by way of illustration. And the theory of the general government is, that these subjects, in their full extent and entire details, being placed under the jurisdiction of the general government, are necessarily withdrawn from the jurisdiction of the state, and the jurisdiction of the general government therefore becomes exclusive. And this is necessary to prevent constant collision and interference; and it is obvious that it must be so, because two distinct governments cannot exercise the same power, at the same time, on the same subject matter. This is not left to mere implication. It is expressly declared, in art. 1, § 8, that congress shall have power to make all laws which shall be necessary and proper, for carrying into execution all the powers vested by the constitution in the government of the United States, or

in any department or officer thereof. And by art. 6, " this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land ; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding." All such laws made by the general government, upon the rights, duties and subjects, specially enumerated and confided to their jurisdiction, are necessarily exclusive and supreme, as well by express provision, as by necessary implication. And the general government is provided with its executive, legislative and judicial departments, not only to make laws regulating the rights, duties and subjects thus confided to them, but to administer right and justice respecting them in a regular course of judicature, and cause them to be carried into full execution, by its own powers, without dependence upon state authority, and without any let or restraint imposed by it.

It was, as we believe, under this view of the right of regaining specifically the custody of one from whom service or labor is due by the laws of one state, and who has escaped into another, and under this view of the powers of the general government, and the duty of congress, that the law of February 12, 1793, was passed. Act of 1793, c. 7, (1 U. S. Stat. at Large, 302.) It was passed at the second congress, so soon after the adoption of the constitution, that many of the members may be well presumed to have been members of the convention, and all of them to have been intimately conversant with the great principles of the constitution, and with the views, intentions, and purposes of its framers. This species of contemporaneous construction has ever been regarded as of great weight and importance, and is entitled to the highest respect. It bears with a great weight of authority upon two points ; first, as to the power and duty of congress to pass laws to secure and carry into effect a right confirmed by the constitution of the United States; and secondly, as to the fitness of the provisions of law thereby adopted, and their adaptation to the proper and practical assertion of the right secured by the constitution.

The act of 1793, made for the purpose of providing and declaring the manner in which the claim shall be made for the fugitive from service, who has escaped, is substantially as follows: That when any person held to labor in any of the United States, or in either of the territories, under the laws thereof, shall escape into any other of the said states or territories, the person to whom such labor may be due, his agent or attorney, is empowered to seize or arrest such fugitive, and to take him or her before any judge of the circuit or district courts of the United States, residing or being within the state, or before any magistrate of a county, city or town corporate, wherein such seizure or arrest shall be made; and upon proof, to the satisfaction of such judge or magistrate, that the person so seized doth, under the laws of the state or territory from which he fled, owe service to the person thus claiming him, it shall be the duty of such judge or magistrate to give a certificate to the claimant, which shall be a sufficient warrant for removing the fugitive to the state or territory from which he fled.

The manifest intent of this act of congress was, to regulate and give effect to the right given by the constitution. It secured to the claimant the aid and assistance of certain magistrates and officers, to enable him to exercise his right in a more regular and orderly manner, and without being chargeable with a breach of the peace. It obviously contemplated a prompt and summary proceeding, adapted to the exigency of the occasion, in aid of a power, in terms conferred by the constitution on the claimant. It vested the power of inquiry, (whether regarded as judicial or otherwise,) the same power which is now drawn in question, in magistrates of counties, cities or towns corporate. As to the mode of trial contemplated by this act, it is described by Mr. Justice McLean, in his opinion in *Prigg* v. *Pennsylvania*, 16 Peters, 539, 667, in these terms: " Both the constitution and the act of 1793 require the fugitive from labor to be delivered up on claim being made by the party, or his agent, to whom the service is due. Not that a suit should be regularly instituted. The proceeding authorized by the law is summary and informal.

The fugitive is seized and taken before a judge or magistrate within the state, and on proof, parol or written, that he owes labor to the claimant, it is made the duty of the judge or magistrate to give the certificate, which authorizes the removal of the fugitive to the state from whence he absconded." A historical fact is mentioned by the same learned judge, (p. 660,) which may throw some light not only on the introduction of the constitutional provision, but on the form of the law intended to carry it into effect. "At an early period," says he, "of our history, slavery existed in all the colonies; and fugitives from labor were claimed and delivered up under a spirit of comity or conventional law among the colonies." If such was the practice when the colonies were independent of each other in their municipal laws or regulations, and even after a partial union by the articles of confederation, which made no provision on the subject, may it not be reasonably conjectured, that this claim to custody of the person of the alleged slave, when there was no positive law to regulate it, was enforced through the medium of colonial magistrates, exercising analogous powers in similar cases, and may not this have suggested the method provided for in the act of 1793?

By the act of 1793, the authority of issuing a warrant to arrest a fugitive from labor, of inquiring into the fact both of owing labor and of having escaped, and of granting a certificate, is conferred on justices of the peace, appointed for a term of years, and without salary, by the state government, or on the magistrates of cities and towns corporate. It is very manifest, therefore, that these powers were not deemed judicial by the congress of 1793, in the sense in which it is now insisted that the commissioner, before whom the petitioner has been brought, is in the exercise of judicial powers not warranted by the constitution, because not commissioned as a judge, nor holding his office during good behavior. Indeed, it is difficult, by general terms, to draw a precise line of distinction between judicial powers and those not judicial. It is easy to designate the broad line, but not easy to mark the minute shades of difference between them. Those officers who hold courts, and have civil and criminal jurisdiction,

beyond doubt, exercise judicial powers, But there are, under every government, functions to be exercised, partly judicial and partly administrative, which yet require skill and experience, judgment, and even legal and judicial discrimination, which it is more difficult to classify. So under our own government, in the constitution of which a similar provision is found, requiring all judicial officers, excepting justices of the peace, to be commissioned and hold their offices during good behavior, we find many such cases. Such are bank commissioners, county commissioners, sheriffs, when presiding over and instructing juries impanelled to assess road damages and damages for flowing land; commissioners of insolvency on the estates of deceased persons and of living insolvent debtors, masters in chancery, and many others.

Now so far as we understand it, commissioners of the circuit court of the United States are officers exercising functions very similar to those of justices of the peace under the laws of the commonwealth. They are commonly appointed from among counsellors at law, of some standing and well reputed for professional skill and experience. Their duty is to inquire into violations of the laws of the United States, to hear complaints, issue warrants, hold examinations, and bind over or commit persons for trial for offences. These are functions requiring considerable skill and experience in the administration of justice, and it is just to presume that they are duly qualified to perform their duties. Would it not be competent for congress, under the powers vested in the general government, to provide by law for the appointment of justices of the peace, in each district, to be vested with powers under the laws of the United States, analogous to those exercised under state laws by justices of the peace under the state governments, without commissioning them as judges during good behavior, or giving them fixed salaries?

At the same time it may be proper to say, that if this argument, drawn from the constitution of the United States, were now first applied to the law of 1793, deriving no sanction from contemporaneous construction, judicial precedent, and the acquiescence of the general and state governments,

the argument from the limitation of judicial power would be entitled to very grave consideration.

But we are not entitled to consider this a new question; we must consider it settled and determined by authorities, which it would be a dereliction of official duty, and a disregard of judicial responsibility, to overlook.

We have already referred to the great weight to be given, in the exposition of statutes, to what may be regarded as contemporaneous construction; and this construction is of the more importance, when the question turns upon the constitutionality of a legal enactment, made soon after the adoption of the constitution, and for the avowed purpose, not only of conforming strictly to the powers given by the constitution, but of carrying out the very objects and purposes contemplated by it.  To this is now to be added an acquiescence both of the state and general governments, of their representatives and people, for nearly sixty years, and a series of judicial decisions, by the highest courts of our own and of the other states, and also of the supreme court of the United States, whose authority upon controverted questions, within their jurisdiction, and declared by their judgments, is binding upon the judges of state courts.

The constitutionality of the act of 1793, came directly before this court, and was argued and decided in 1823.  *Commonwealth* v. *Griffith*, 2 Pick. 11.  The opinion of the court was delivered by that most · humane man and enlightened magistrate, the late Chief Justice Parker.  After disposing of a technical question, he says : " This brings the case to a single point, whether the statute of the United States, giving power to seize a slave without a warrant, is constitutional." After alluding to the relative condition of the states, and the circumstances under which the constitution was made, he says : " They [the states by whose laws slavery was permitted] might have kept aloof from the constitution.  That instru ment was a compromise.  It was a compact by which all are bound.  We are to consider, then, what was the intention of the constitution."  Again ; "the constitution does not prescribe the mode of reclaiming a slave, but leaves it to be determined

by congress." " Whether the statute is a harsh one, is not for us to determine." " We do not perceive that the statute is unconstitutional, and we think the defence is well made out." The chief justice added, that this construction of the statute had been adopted ever since the federal constitution went into operation, by Lowell and Davis, justices of the district court of the United States. To weaken the force of this precedent, it has sometimes been said, when the case has been cited in argument, that this opinion was not unanimous. It is true, that Thatcher, J., dissented from the majority, as to the construction of the law; but he did not doubt its constitutionality. He admitted that congress might prescribe a new mode of apprehending a fugitive from service, which should supersede our law. In answer to the objection to the constitutionality of this statute, it was pressed upon the consideration of the court, in that case, that it had been in operation then thirty years, and its constitutionality had never been before questioned. If that consideration had weight with the court then, the acquiescence of thirty years more has greatly increased it.

I shall next cite the case of *Wright* v. *Deacon,* 5 S. & R. 62, in the supreme court of Pennsylvania, and I do it the more readily, because the opinion was delivered by Tilghman, C. J., whose authority was cited in the argument of this case. It arose on a writ *de homine replegiando,* sued out by a person claimed as a slave, against the prison keeper in whose custody he was detained, under a certificate granted conformably to the act of congress of 1793. He says that it is well known that the constitution could not have been adopted, unless the property in slaves had been secured; and that this constitution had been adopted by the free consent of the citizens of Pennsylvania. He then cites the article in the constitution. But, he says, it required a law to regulate the manner in which this principle should be reduced to practice, and cites the act of congress made for that purpose, and continues: " It plainly appears from the whole scope and tenor of the constitution and act of congress, that the fugitive was to be delivered up, on a summary proceeding, without the delay

26 *

of a formal trial in a court of common law." " But if this writ of *homine replegiando* is to issue from a state court, what is its effect, but to arrest the warrant," [issued under the act of congress,] " and thus defeat the constitution and law of the United States? The constitution and the law say, that the master may remove his slave by virtue of the judge's certificate; but the state court says that he shall not remove him. It appears to us, that this is the plain state of the matter, and that the writ has been issued in violation of the constitution of the United States. We are therefore of opinion that it should be quashed."

The same principles have been decided by the supreme court of the state of New York. *Jack* v. *Martin*, 12 Wend. 311. This case was also commenced by a writ *de homine replegiando*, corresponding with our writ of personal replevin, sued out by the fugitive and alleged slave against his mistress. The case is full and decisive. The opinion, as delivered by Mr. Justice Nelson, is very instructive, but too long to be quoted here. It affirms the right of the master, as established by the constitution, the power and duty of the general government to pass laws to secure the right by suitable and practicable means, the exclusive power of congress to pass such laws, and the invalidity of all state laws on the subject.

But the judicial authority most to be relied on, and which, when distinctly ascertained, is binding and conclusive upon all subjects within their special jurisdiction, is that of the supreme court of the United States. Before the case hereafter cited, the question had come before Mr. Justice Washington, then of the supreme court of the United States, on the circuit, in *Hill* v. *Low*, 4 Wash. C. C. 327, in which he expressed his opinion in favor of the constitutionality of the act of congress to which I refer.

A case came before the supreme court of the United States, in 1842, on a special verdict, in which the point in question was fully discussed and deliberately settled. *Prigg* v. *Pennsylvania*, 16 Pet. 539. There was some difference of opinion among the judges upon minor points, but none, it is believed, upon the subject now under consideration, the constitution-

ality and binding force of the act of congress of 1793, and especially of that part of it which confers an authority on circuit and district judges, and on county and city magistrates, to take a summary jurisdiction, in the manner provided by the act of 1793. Some of the majority were of opinion, that congress could not, by its own enactments, require state officers, such as magistrates of counties, cities, and towns corporate, to take upon themselves the duty of exercising such jurisdiction; but they conceded, that the law conferred a sufficient authority on them to act, if they should think fit to do so, voluntarily, and if they were not restrained by state legislation. On the other hand, Mr. Justice McLean, agreeing to the general rule, as to state officers, was of opinion, that, under the peculiar circumstances, congress had the power to enforce this duty upon magistrates, and that they were not at liberty to decline it, but were legally bound to execute it. All the judges were agreed, that the state could make no law, and adopt no regulation, which would impair the right of an owner to pursue and retake a fugitive from labor; but they differed in one particular. The majority were of opinion, that the whole subject being placed under the jurisdiction of the general government, the state governments could make no law on the subject, even in aid of the claim of the slave owner; basing their judgment on the ground, that as the whole subject was placed exclusively under the cognizance of the general government, it was for congress to make all the rules and regulations upon the subject; that it was to be presumed they had, in the law in question, made sufficient rules and regulations to give effect practically to the right intended to be secured; and if that had not been done, it was solely for congress to supply the deficiency. They also relied on the ground, that if state laws went further into detail, and made provision for a course of proceeding beyond that indicated by the act of congress, it might tend to interfere therewith, and that if they prescribed precisely the same modes, they would be merely superfluous and embarrassing. On the contrary, some of the judges were of opinion, that the state legislatures might make laws on the subject, provided only that they should in no way impede or

hinder the proceedings under the law of congress. ` These, it is believed, are the principal differences in the opinions of the different judges. They all concur in the construction of the constitution, as intended to secure the right of a slave owner to regain the custody of a slave, who has escaped from service; in the right of the master to reclaim him in other states; in the constitutionality of the law of congress; and the nullity and invalidity of any and every state law which would impair the right, or impede or interfere with the provisions of the act of congress, providing for a summary proceeding before a judge or magistrate. Mr. Justice Baldwin concurred in the judgment of the court, but dissented from the principles laid down by the court as the grounds of their opinion, yet stated none of his own. He had, however, previously expressed an opinion on the circuit, that the act was constitutional, in the case of *Johnson* v. *Tompkins*, Bald. 571. The case in 16 Pet. appears to us to be authoritative and decisive, and it was so considered by the supreme court of the United States in the case of *Jones* v. *Van Zandt*, 5 How. 215, 229.*

We have thought it important thus to inquire into the validity and constitutionality of the act of 1793, because it appears to be decisive of that in question. In the only particular in which the constitutionality of the act of congress of 1850 is now called in question, that of 1793 was obnoxious to the same objection, viz., that of authorizing a summary proceeding before officers and magistrates not qualified under the constitution to exercise the judicial powers of the general government. Congress may have thought it necessary to change the preëxisting law, not in principle but in detail, because, as we have seen in the case of *Prigg* v. *Pennsylvania*, some of the judges were of opinion that state magistrates could not act under the authority conferred on them by the act of 1793, when prohibited from doing so by the laws of their own state, and some states had in fact passed such pro· hibitory laws. The present fugitive slave law may vary in other respects, and provide other and more rigorous means for

---

* See, also, charge of Nelson, J., to the grand jury, 1 Blatchf. Rep. 636.

carrying its provisions into effect, but these are not made grounds of objection to its constitutionality.

We do not mean to say that this court will in no case issue a writ of *habeas corpus* to bring in a party, held under color of process from the courts of the United States, or whose services, and the custody of whose person, are claimed under authority derived from the laws of the United States. This is constantly done, in cases of soldiers and sailors, held by military and naval officers, under enlistments complained of as illegal and void. But it is manifest that this ought to be done only in a clear case, and in a case where it is necessary to the security of personal liberty from illegal restraint.

It seems to us to be the less necessary to call into action the powers of the state judiciary, in a case like this, because it is quite competent for the judges of the United States courts to bring the petitioner before them by *habeas corpus*, and ascertain whether he is detained by an illegal and colorable authority of an officer, claiming to act under the laws of the United States. This consideration is perhaps of no other importance, than as showing that there is no necessary occasion for drawing the authority of the state and the United States judiciary into conflict with each other. Such a conflict can hardly arise, although it may often seem impending; because it must generally appear, upon a cool and deliberate examination of all the facts and circumstances, whether a subject to which a law of congress relates is or is not within the jurisdiction of the general government; if it be so, it is conclusive. All judges of all courts are obliged to act on the same principles, and be governed by the same rules of duty; they are bound alike by oath to support the constitution of the United States, which declares that the constitution itself, and all laws made pursuant to it, shall be the supreme law of the land.

On the whole, we consider that the question raised by the petitioner, and discussed in the argument before us, is settled by a course of legal decisions which we are bound to respect, and which we regard as binding and conclusive upon this court.

Since the argument in court, this morning, I am reminded by one of the counsel for the petitioner, that the law in ques tion ought to be regarded as unconstitutional, because it makes no provision for a trial by jury.* We think that this cannot vary the result. The law of 1850 stands, in this respect, precisely on the same ground with that of 1793, and the same grounds of argument which tend to show the uncon-stitutionality of one apply with equal force to the other; and the same answer must be made to them.

The principle of adhering to judicial precedent, especially that of the supreme court of the United States, in a case de-pending upon the constitution and laws of the United States, and thus placed within their special and final jurisdiction, is absolutely necessary to the peace, union and harmonious action of the state and general governments. The preser-vation of both, with their full and entire powers, each in its proper sphere, was regarded by the framers of the constitution, and has ever since been regarded, as essential to the peace, order and prosperity of all the United States.

If this were a new question, now for the first time presented, we should desire to pause and take time for consideration. But though this act, the construction of which is now drawn in question, is recent, and this point, in the form in which it is now stated, is new, yet the solution of the question depends upon reasons and judicial decisions, upon legal principles and a long course of practice, which are familiar, and which have often been the subject of discussion and deliberation.

Considering, therefore, the nature of the subject, the urgent necessity for a speedy and prompt decision, we have not thought it expedient to delay the judgment. I have, therefore, to state, in behalf of the court, under the weighty responsibility which rests upon us, and as the unanimous opinion of the court, that the writ of *habeas corpus* prayed for cannot be granted.                                    *Writ refused.*

---

* See Const. of U. S. Amendments V. & VII.; 3 Story on the Constitution, §§ 1639, 1640, 1783; 2 Inst. 50 to 54; *Lee* v. *Lee*, 8 Pet. 44; *Parsons* v. *Bedford*, 3 Pet. 433, 456; *Baker* v. *Biddle*, Bald. 394, 404.

Note. In delivering the opinion of the court in this case, allusion was made to the condition of the states, after the peace and before the adoption of the constitution, and to what would have been their condition, as independent states, had not the constitution been adopted. It was sufficient for the opinion then announced, to refer to this consideration in the briefest manner. But as it appears to me to have an important bearing upon the principal question, I have thought it useful to state the argument derived from that source, somewhat more fully, and to cite the authorities in support of it, by way of note to the opinion of the court.

The allusion in the opinion of the court was to the actual condition of the several states of the union, after their independence had been admitted by the treaty of peace, and before the adoption of the constitution. In construing a treaty or compact, made between two or more parties, it is a good rule for expounding the act, and considering the true intent and meaning of the terms in which it is expressed, to examine and ascertain what was the condition of the respective parties; what would have been their relative rights, powers, duties and obligations, had not such compact been entered into; and thus to determine how that condition was affected, and those rights, powers, duties and obligations limited, changed or qualified, by the actual stipulations of the compact.

It is too clear and manifest to require proof, that, independently of the qualified alliance, created by the articles of confederation, which it is conceded contained no stipulation on the subject of fugitive slaves, the several states would have been sovereign and independent, invested with all the rights and powers which are regarded by the received laws of nations as incident to sovereignty. Amongst these, is the absolute right of each state to regulate, by its laws, the conduct, state and condition of all persons and things within its limits; to prohibit the entrance of all persons, and the introduction of all things, according to its own views of its own policy and best good. And each is under a corresponding obligation to respect the territorial rights of others, and so to regulate the conduct of all persons within its own territory, as to prohibit them

from committing acts of violence or wrong on the territory of others, and to prevent its territory from becoming the asylum for persons or things injurious to another state. Each would have been entitled to defend its own rights, and to enforce the performance of these duties from others, by war, and, of course, to qualify and regulate the use and enjoyment of them by treaties of peace, and other mutual compacts.

Assuming this to be an outline of the rights and duties of sovereign states towards each other, stated in the briefest and most general terms, it becomes necessary to inquire what would have been their condition in respect to slaves and slavery, supposing that slavery was sanctioned and upheld by the laws of some, and abolished and prohibited by the laws of others. In doing this, it will be necessary to do little more than cite the case of *Commonwealth* v. *Aves*, 18 Pick. 193, 210, and the cases there cited and commented on.

By the received laws of nations, it seems to be well established, that however odious we may consider slavery and the slave trade, however abhorrent to the dictates of humanity and the plainest principles of justice and natural right, yet each nation has a right, in this respect, to judge for itself, and to allow or prohibit slavery by its own laws, at its own will; and that whenever slavery is thus established by positive law within the limits of such state, all other nations and people are bound to respect it, and cannot rightfully interfere, either by forcibly seizing, or artfully enticing away slaves, within the limits of the territory of the nation establishing it, or on the high seas, which are the common highway of nations. In the case cited, the language of this court is this : " In considering the law of nations, we may assume that the law of this state is analogous to the law of England in this respect; that while slavery is considered as unlawful and inadmissible in both, because contrary to natural right, and the laws designed for the security of personal liberty, yet, in both, the existence of slavery in other countries is recognized, and the claims of foreigners, growing out of that condition, are, to a certain extent, respected." In *Sommersett's case*, before Lord Mansfield, in 1771, 20 Howells's State Trials, 1, 82, which is the leading

case on this subject, and establishes the doctrine of the natural right to personal liberty in its fullest extent, we find a clear intimation of the principle above stated. Slavery, said Lord Mansfield, " is of such a nature that it is incapable of being introduced on any reasons, moral or political, but only by positive law." " It is so odious, that nothing can be suffered to support it, but positive law." But this is a clear admission, and indeed this is manifest throughout his opinion, that although odious and contrary to natural right, it may exist by force of positive law. And this may be mere customary law, as well as the enactment of a statute. The term " positive law," in this sense, may be understood to designate those rules, established by long and tacit acquiescence, or by the legislative act of any state, and which derive their force and effect as law from such acquiescence or legislative enactment, and are acted upon as such, whether conformable to the dictates of natural justice or otherwise.

The principle is, that although slavery and the slave trade are contrary to justice and natural right, yet each nation, in this respect, may establish its own law, within its own territory. And even the slave trade is not regarded as piracy, even by those states who regard it in the abstract as unjust, except when it has been declared so by statute, which can only operate within its own limits; or except when it has been so declared by treaty between two or more powers, in which case it may be so regarded as between such powers, their citizens and subjects. This is confirmed by the English and American authorities, although the governments of both the United States and England have made strong declarations and passed ' very severe laws against the slave trade.

I refer to the case of *The Diana*, 1 Dodson, 95. A Swedish ship, captured on the high seas, with a cargo of slaves on board, by an English vessel, was carried into Sierra. Leone, and there condemned. On appeal to the high court of admiralty, she was ordered to be restored by Sir William Scott, on the principle that the slave trade was allowed by the laws of Sweden.

*Le Louis*, 2 Dodson, 236, was the case of a French vessel

seized by an English vessel in time of peace. An elaborate opinion was given by Sir William Scott, in which he stated, that a right of visitation could only be exercised in time of war, or against pirates; and that the slave trade was not piracy by the laws of nations, except against those by whose government it has been so declared, or by treaty.

Two common law cases are cited in *Commonwealth* v. *Aves*, 18 Pick. 213, 214; *Madrazo* v. *Willes*, 3 B. & Ald. 353; *Forbes* v. *Cochrane*, 2 B. & C. 448, and 3 Dowl. & Ry. 679. It would be desirable to state these cases more at length; but full abstracts of them are given in 18 Pick., at the pages cited, and they are directly in point. I will only quote from the first case cited above, a remark of Mr. Justice Best, who says that the statutes of Great Britain " speak in just terms of indignation of the horrible traffic in human beings; but they speak only in the name of. the British nation. If a ship be acting contrary to the general law of nations, she is thereby subject to confiscation; but it is impossible to say that the slave trade is contrary to what may be called the common law of nations." In that case, in a suit in a British court, a foreign slave owner was permitted to add to his damages the value of certain slaves taken from a vessel wrongly interrupted in a voyage on the high seas by a British vessel.*

These authorities were recognized and confirmed, and the same principle declared, on great consideration, by the supreme court of the United States, in the case of *The Antelope*, 10 Wheat. 66. The positions affirmed are, that the slave trade is contrary to the law of nature, but is not prohibited by the positive law of nations; that the slave trade may be lawfully carried on by the subjects of those nations who have not prohibited it by municipal laws or treaties; that the slave trade is not piracy, unless made so by the treaties or statutes of the nation to which the party belongs. These positions are fortified in the opinion of the court pronounced by Chief Justice Marshall, by reasons which must be regarded as quite conclusive.

* See also *Buron* v. *Denman*, 2 Welsb. Hurlst. & Gord. 167, 186.

If the slave trade can be so legalized by the local and posi‐ tive law of any particular nation for its own subjects; if this odious traffic cannot be denounced as piracy, and treated as a violation of the laws of nations; *a fortiori* may the existence of domestic slavery be legalized by the laws of such nation, within its own limits, so that the rights growing out of it shall be respected by foreign powers, their citizens and sub‐ jects.

The result of this inquiry is summed up in the case cited, 18 Pick. 215, as follows : " Upon a general review of the author‐ ities, and upon an application of the well established princi‐ ples upon this subject, we think they fully maintain the point stated, that, though slavery is contrary to natural right, to the principles of justice, humanity and sound policy, as we adopt them and found our own laws upon them, yet, not being con‐ trary to the laws of nations, if any other state or community see fit to establish and continue slavery by law, so far as the le‐ gislative power of that country extends, we are bound to take notice of the existence of those laws, and we are not at liberty to declare and hold an act done within those limits unlawful and void, which the sovereign and legislative power of the place has pronounced lawful. If, therefore, an unwarranted interference and wrong is done by our citizens to a foreigner, acting under the sanction of such laws, and within their pro‐ per limits, that is, within the local limits of the power by whom they are thus established, or on the high seas, which each and every nation has a right in common with all others to occupy, our laws would no doubt afford a remedy against the wrong done."

It seems, therefore, to be conclusively settled, that it belongs to each independent power to decide for itself, whether it will uphold and maintain by its laws the existence of slavery ; and although other powers may denounce it, and declare it founded in force and violence, injustice and wrong, yet they cannot disregard the rights flowing from it, when legalized by another power. The relative rights and obligations of independent powers on this subject are clearly stated in the opinion of Chief Justice Marshall, already cited. 10 Wheat. 122. Each

government, he says, "may renounce this right for its own people; but can this renunciation affect others? No principle of general law is more universally acknowledged than the perfect equality of nations. Russia and Geneva have equal rights. It results from this equality, that no one can rightfully impose a rule on another. Each legislates for itself; but its legislation can operate on itself alone. A right, then, which is vested in all, by the consent of all, can be divested only by consent." " As no nation can prescribe a rule for others, none can make a law of nations."

If then these states, prior to the adoption of the constitution, would have been sovereign and independent, these views of the established and recognized laws of nations indicate clearly what would have been their relative condition, and their respective rights. Slavery was likely to subsist in some states, and to be abolished in others. Each would have been clothed with certain rights, and bound to the performance of certain duties, which each would have a right to defend and enforce by war, to which there would be a constant temptation; and this could only have been avoided by treaty, regulating and providing for the enjoyment and security of such rights. It would have been in vain to say, that slavery being founded in wrong and injustice, any treaty tending to assent to, uphold and sanction it, would be itself immoral and wrong, and so could not conscientiously be made. Nations cannot elect the subjects on which they will treat; treaties are often made under great exigencies, as the best alternative which can be resorted to in order to avoid greater evils. In the infancy of our commerce and of our political power, we thought it not wrong to make treaties with the Algerines, and other piratical powers of the coast of Barbary, who had committed depredations on our commerce, and carried our citizens into captivity. We made treaties for ransoming our citizens held in slavery, and paid tribute to these acknowledged pirates, to induce them to forbear plundering our commerce, although such payments contributed directly to the upholding and encouragement of robbery and piracy. Having made such treaties, nobody would doubt that it was our duty to fulfil

them to the letter, any more than they would doubt our per-
fect right to refuse renewing them, the moment we were able
to defend our own rights by our own strength.   No ; in mak
ing a treaty, we must take our relations with others as we
find them ; and make the best provision for our rights which
is practicable under the circumstances.   The question is, in
adopting or rejecting a proposed mutual stipulation, not whe-
ther it is the most desirable on general grounds of expediency,
but whether it is preferable' to that which is the inevitable
alternative if this is rejected.

But if no binding treaty could be made on the subject of
slavery, what would have been the necessary alternative ?   It
would have been a state of things in which acknowledged
rights were in constant danger of being drawn into conflict
between neighboring states, leading to a war likely to be
perpetual, or perhaps to a still more disastrous result — that
of some states being subjugated by others of superior phy-
sical strength, in a contest in which right and wrong would
be disregarded, and violence and brute force would supersede
the government of law and the reign of peace.   Can this be
regarded as an inflamed or exaggerated view of the condition
of these states, as independent, but without compact with
each other, if the views of the laws of nations above stated
are correct ?   The states were equal in right, but unequal in
power.   In view of the laws of nations, there was no differ-
ence between Rhode Island and Virginia, or Pennsylvania
and Delaware.   With equal rights, constantly in danger of
being brought into conflict, with radical differences of opinion
and views, both of justice and policy, on the subject of sla-
very, the danger of hostile collision was imminent.   What
alternative was there, but either a general treaty of alliance or
a league, or a union under one government, to whom should
be confided all these subjects of common and mutual interest.
The latter expedient was adopted.   The several states agreed
to renounce their rights of sovereignty to a limited extent;
among other subjects, the regulation of their intercourse with
foreign powers, with the Indian tribes and with each other ; the
right of war and peace, and that of making treaties either with

27 *

foreign powers or with each other. Certain other subjects of common interest were also surrendered, and placed under the exclusive control and jurisdiction of the common government. Instead of enforcing their rights, as they could have done before, only by war, it was agreed to establish a general government, furnished with full and complete legislative, judicial and executive powers, to take cognizance of these rights, to provide by law for the regulation of them, to declare and apply them in an o.derly course of judicature, and to carry them into full effect. On coming to this arrangement, it could not be kept out of view, that some states had large numbers of slaves, and were disposed to uphold and sanction the existence of slavery by their laws; whilst others denounced it and held it in abhorrence, as unjust and criminal, alike opposed to natural right and to good policy. It could not, however, but be known to the framers of the constitution, that in the states where slavery was allowed by law, certain rights attached to its citizens, which were recognized by the laws of nations, and which could not be taken away without their consent. They therefore provided for the limited enjoyment of that right, as it existed before, so as to prevent persons owing service under the laws of one state, and escaping therefrom into another, from being discharged by the laws of the latter; and authorized the general government to prescribe means for their restoration. This is the *casus fœderis;* to this extent the states are bound by their compact, but no further. Slavery was not created, established or perpetuated by the constitution. It existed before; it would have existed if the constitution had not been made. The framers of the constitution could not abrogate slavery, or the qualified rights claimed under it; they took it as they found it, and regulated it to a limited extent. The constitution, therefore, is not responsible for the origin or continuance of slavery. The provision it contains was the best adjustment which could be made of conflicting rights and claims, and was absolutely necessary to effect what may now be considered as the general pacification, by which harmony and peace should take the place of violence and war. These were the circumstances, and this the spirit.

in which the constitution was made; the regulation of slavery, so far as to prohibit states by law from harboring fugitive slaves, was an essential element in its formation; and the union intended to be established by it was essentially neces-sary to the peace, happiness and highest prosperity of all the states. In this spirit, and with these views steadily in pros-pect, it seems to be the duty of all judges and magistrates to expound and apply these provisions in the constitution and laws of the United States; and in this spirit it behooves all persons, bound to obey the laws of the United States, to con-sider and regard them.

The duties and relations of the states to each other, by the laws of nations, anterior to the making of the constitution, and the qualified but acknowledged right arising from the establishment of slavery in some states, and its exclusion in others, having been alluded to briefly in the opinion of the court, it was thought advisable, in this note, to expand the argument somewhat, arising from that consideration, but more especially to state the judicial authorities upon which it rests.