Mr. Justibe WOODBURY
 

 delivered the opinion of the court.
 

 This case comes here on a division of opinion in the Circuit Court of Ohio.
 

 The subject-matter of the original suit was debt for a penalty of §500, under the act of Congress of February 12th, 1793, for concealing and harbouring a fugitive slave belonging, to the plaintiff.
 

 The certificate of the, division of opinion, as will be seen in the record, relates to various questions, arising under two,heads.
 

 
 *224
 
 First, on rulings made at the trial, and, secondly, on a motion' in arrest of judgment.'
 

 These questions extend to the unusual number of fourteen. Not, however, that the presiding judge in the circuit and his associate entertained strong doubts concerning, the general principles involved in them all, as may be seen in the report of the case, (2 McLean, C. Ci 615), but because the questions involved could not. otherwise be brought here ; and they possessed so wide and deep an interest, as to render it desirable they should come under the revision'of this court.
 

 For that purpose, in conformity to what is understood, to have been the usage in the circuits, they accommodated the parties by letting a division
 
 pro forma,
 
 be entered on all the points presented.
 

 It is not understood that any of them embrace things urged
 
 merely
 
 as reasons for a a new trial. For if they did, —;as such a trial rests in the discretion of the court, and is not a matter of strict right, — a division of opinion in relation to it furnishes no cause for bringing the case here for our decision on questions certified. United States
 
 v.
 
 Daniell, 6 Wheat, 542; 4 Wheat. 213; 5 Cranch, 11, 187; 4 Wash. C. C. 333.
 

 Before entering on the examination of the points, it will make several of them more intelligible, if we advert to the clause in the constitution bearing on this subject, and the act of Congress under which the action was instituted.-
 

 The former is, that “ No person held to serv;ce or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered-up on claim of the party to whom such service or labor may be due.” — Art. IV., § 2.
 

 In respect to the statute, it will not be necessary to repeat here any of it, except portions of the 3d and 4th sections : —
 

 § 3. “ And be it also enacted, That when a person, held to labor m any of the United States or in either of the territories on the. northwest or south of the river Ohio, under the laws thereof, shall escape into any other of the said States or Territory, the person to whom- su.ch labor or .service may be due, his agent or attorney, is hereby empowered to seize Or arrest such fugitive from labor.”
 

 § 4.'
 
 “
 
 And be it further enacted, rtfiat ány pérson who shall knowingly and willingly obstrúct or hinder such claimant, his agent or attorney, in so seizing or arresting such, fugitive from labor, or shall rescue such fugitive from such claimant, his agent or attorney,' when so arrested pursuant to the authority herein given or declared, or shall harbour or conceal süch person, after notice that he, or she was a fugitive from labor, as aforesaid, -shall, for either of tjie said offences, forfeit and pay. the sum of. five hundred' dollars.1” t— 1 Statutes at Large, 303, 305, Act of Feb. 12, 1793..
 

 
 *225
 
 The first question at the trial on which a division arose was, in substance, whether the “ notice ” referred to in the 4th section-must be in writing.
 

 No doubt exists with this court that it may' be otherwise than in .writing, if it only bring home clearly ,to the defendant knowledge that the person he concealed was “ a fugitive from labor.”
 

 The offence consists in continuing to' secrete from the owner what the acts of Congress and the constitution, as well as the laws of several of the States, treat, for certain purposes, as property, after knowing that claims of property exist in respect to the fugitive.
 

 Now die act of Congress does not, in terms, require the notice to be in writing, nor does the reason of the provision, nor the evil to be guarded against, nor any sound analogy.
 

 ■The reason of the provision' is merely, that the party shall havé notice or information sufficient to put him on inquiry, whether he is not intermeddling with what belongs to another..
 

 If the information given to him, orally or in writing, is such as ought to satisfy a fair-minded man that he is concealing the property of another, it is his duty under the-constitution and laws to cease to do it longer. Eades
 
 v.
 
 Vandeput, 5 East, 39, note; Blake
 
 v.
 
 Lanyon, 6 D. & E. 221.
 

 Such a notice is' sufficient also by way of analogy ; as, for instance, notice in relation to a prior claim on property purchased. The Ploughboy, 1 Gall. 41; 9 Jurist, 649; 1 Sumner, C. C. 173; 1 Cranch, 45. Or of a prior defence or set-off againtet a demand assigned to him. Humphries
 
 v.
 
 Blight’s Assignees, 4 Dall. 370. Or even in crimes, that the notes or coin one is passing away are counterfeit.
 

 Any other construction would go, likewise, beyond the evil to be avoided by the notice, which was 'the punishment of an individual for harbouring or concealing a person,. without having reasonable grounds to believe he was thereby injuring another.
 

 Any other construction, too, would be suicidal to the law itself, as before a notice in writing could be prepared and served on the defendant, the fugitives would' be -carried beyond the reach of recovery in many cases, and in others would have passed into unknown hands.
 

 This is not a case like some cited in the argument, where the party prosecuted was not concerned in getting away the apprentice or person harboured, but merely entertained him afterwards from hospitality, or in ignorance of his true character-and condition.'
 

 Then a more formal notice and demand of restoration may be proper, before suit, in order to remove any doubts as to the condition of the fugitive who is thus entertained, or the intent of the master to enforce his rights and reclaim his property. 1 Chit. Gen. Prac. 449.. But verbal' notice is enough then. See the- cases in East and Durnford & East, just 'cited.
 

 
 *226
 
 Besides this, the present is a case where the defendant was a partaker in accomplishing the escape itself,
 
 like,aparticeps criminis,.
 
 and where the concealment and harbouring were not after the escape was over, but during its progress, while the slaves were
 
 in transitu;
 
 and where the notice is not exclusively with a view to procure their restoration, but is also' an element in the case to show whether the party was, knowingly or ignorantly as to their condition, rendering them assistance to escape by temporarily hárbouring or secreting them. So far as regards this point, it is a question merely of
 
 scienter.
 
 No matter how or whence the knowledge came, if it only existed. The concealment here was practised during fresh pursuit to retake the slaves ; and hence, without any formal. notice or demand, no doubt could exist as to the wish to reclaim them, as well as the fact of their being .slaves. See Hart
 
 v.
 
 Aldridge, Cowp. 54.
 

 Furthermore, that the defendant has not suffered by the charge to the jury on this point is manifest from his own declarations at the time, that he- knew the fugitives to be slaves (Jones v. Van Zandt, 2 McLean, C. C. 599), and from the instruction to the jury that this fact must be clearly proved before they ought to convict him (p. 607).
 

 This view of the subject disposes of several other points of division connected with it. Because '’very purpose contemplated by the notice is accomplished, without a publication of it previously in a newspaper, which is the second question.
 

 To require such a publication would be entirely arbitrary, and would still more surely defeat the whole law .than to hold the notice must be. in writing, and served on the defendant, before he is liable.
 

 So, as to the third question, whether the information be sufficient if acquired from the slave himself, — it is manifest that such a source of information for that fact is one of the
 
 most
 
 satisfactory, as he has good means of knowing it, and is not likely to admit his want of freedom, unless It actually exist.
 

 The next question relates to what constitutes concealment or harbouring of a slave, within the meaning of this statute.
 

 It seems from the facts, which by agreement are all those reported in the printed case as tried in the court below (2 McLean, 596), as well as those inserted in this record, that several slaves, owned by the plaintiff in Kentucky, escaped from him and fled to Ohio, adjoining, and, aided by some person not named, and when about twelve miles distant from their master’s residence, were taken into a covered wagon by the defendant in the night, and driven with speed twelve or fourteen miles, so that one was never retaken, though fresh suit was made for the whole.
 

 Now, whatever technical definition may exist of the word
 
 conceal
 
 or
 
 harbour,
 
 as applied to apprentices or other subjects, no
 
 *227
 
 doubt can exist, that these words and their derivatives must here be construed in reference to the matter of the. statute,, and the nature of the offence to be punished.
 

 These show this offence to consist often in assistance to escape, and .reach speedily some distant place, where the master cannot find or reclaim such fugitives, rather than in detaining them long in the neighbourhood, or secreting them about one’s premises.
 

 . We see ntohing, then, in the facts here, or in the instruction of the judge on them,
 
 secundum subjectam
 
 materiam, which shows this case not to have been, as the jury found it to be, one .vithin the manifest design of the statute against harbouring and concealing persons who were fugitives from labor, after notice, or full knowledge of their character.
 

 Indeed, the general definition of the word
 
 harbour
 
 in 1 Bouvier, 460, as quoted by the deféndant’s counsel, — saying nothing as to the authority of that work, — is such as to be fully covered by the facts.in this case, as stated in the record, and as found by the jury. It is, — “ to receive clandestinely, and without lawful authority, a person for the purpose of concealing him, so that another, having the right to the lawful custody of such person, shall be deprived of 'the same.”
 

 There was a clandestine reception of the slaves, and without lawful,authority, and a concealment of them in a covered wagon, and carrying them onward and away, so as to deprive the owner of their custody. “ To harbour ” is also ádmitted in the argument often to mean‘c to-secrete.” Such is one of the established definitions by the best lexicographers. Yet here they were secreted, not only, as just stated, by being placed in.a covered wagon, and carried to a greater distance from their master, but it was done rapidly, and in part under the shades of night.
 

 That no mistake on this point occurred at the trial is likewise manifest from the fact, that the judge charged the jury, the defendant must not be considered as harbouring or concealing the slaves, unless his conduct was such, “-as not only to show an intention to elude the vigilance of the master* but such as is calculated to attain that object.” 2 McLean, C. C. 616.
 

 Nor can the recovery of one of the slaves afterwards, who was thus concealed.and transported, vary the previous fact of secreting and harbouring him. That is the fifth inquiry. The answer to the sixth is involved in that to the fourth and fifth ; as is an answer to the seventh in that to the first question. ' Because, if- the notice need not come from the claimant himself, nor be in writing, it need not be preceded or accompanied by a claim, which is .the seventh inquiry. A claim'subsequently made must be equally valid with one before the notice, whether looking to the reason of the case, or •the language of the statute.
 

 The gist of the offence consists in the concealment of another’s
 
 *228
 
 property, under knowledge that it belongs to another, and not in a claim being previously made and refused. That refusal might constitute a separate wrong,- or be another species of evidence to prove a harbouring of the slave,- but it is not the offence itself, for which the penalty now sued for is imposed.
 

 The eighth and last question under this head seems to be an abstract proposition, and does not refer to any particular facts in.the case. But if it-was laid down in relation to some of them, as it must be presumed to have been in order to make it a proper subject for a division of opinion, to be reconsidered v herd, we are not aware of any thing objectionable in it. The “ overt act” spoken of was required to be one both intended and calculated to elude the master’s, vigilance. If so, it showed acts and designs of the defendant, which in the words and spirit of the statute amount or tend directly tó “
 
 harbour or conceal'” the
 
 fugitive
 
 from
 
 labor.
 

 We shall now proceed to the points-of division in-respect, to the motion in arrest. They are, firstly; whether the counts contain the necessary averments,, that the slave Andrew escaped from Kentucky to Ohio.
 

 ' It is admitted that, this prosecution being a penal one, the declaration must bring it within the statute clearly, whether looking to its language or .spirit. Dwarris on Statutes, 736; 5 Dane’s Abr. 244, § 8; Simmons’s case, 4 Wash. C. C. 397. It is not necessary-to multiply authorities on so elementary a proposition.
 

 On.turning to the counts, however, it will be seen that they allege the residence of the plaintiff in Kentucky, — the ownership by him of these slaves, held to' labor there, — and their “ unlawfully,” and “ without his consent,” going from'that place to Ohio, as “ fugitives from labor.” All -these allegations combined, and not merely 'the
 
 going
 
 away, are a clear and sufficient averment of an escape of the slave Andrew under the first objection in arrest. If they contain sufficient matter to show an escape, it need not be alleged in the very words,
 
 ipsissimis
 
 verbis, of the statute. 1 Chit. Pl. 357; The King v. Stevens et al., 5 East, 244.
 

 The ungrammatical use of the word “was”-for “were,” in speaking of hoth. slaves, is urged as an uncertainty which vitiates this part of the declaration. But no one can doubt that both are referred to, and the moreiespecially after a verdict.' As to what is thus covered by a verdict, see Garland
 
 v.
 
 Davies, 4 How. 131, and the cases there cited, and 11 Wend. 374.
 

 The second point certified under the motion in arrest is, whether the “ counts contain the necessary averments of notice that said Andrew was a fugitive from labor within-the description of the act of Congress.”
 

 We cannot doubt that they, do, when the first count alleges that said Andrew was in Ohio, “ a fugitive from labor, and the defendant, well
 
 knowing
 
 .that said- Andrew was the slave of the plaintiff, and a fugitive from labor,”. &C., did harbour .and conceal him.
 

 
 *229
 
 So in respect to the third question connected with the arrest of judgment, which is, whether the averments are sufficient under the statute as to harbouring, the slave Andrew, the answer can be but one way. However strict the construction should be, yet the count alleges, in so many words, that the defendant did “ knowingly and wilfully
 
 harbour,
 
 detain,
 
 conceal,
 
 and keep said slave.”
 

 Under the fourth general objection of insufficiency in the-declaration, no specific point, not otherwise designated, has been, called to our attention, except that all the- acts alleged in the declaration are not said to be “ contrary to the statute.” This last expression follows the concluding portion of the count, and this expression, ■maybe necessary in a penal declaration. Lee
 
 v.
 
 Clark, 2 East, 333; 1 Gall. 259, 265, 271; 1 Chit. Pl. 358.
 

 But all know, that where it is inserted at the end of a declaration-of indictment, it does not, as a general riile, relate to the last preceding averments alone, but the whole subject-matter before alleged to constitute an.offence. It is all'that misconduct which is contrary to the statute, and not the concluding part of it only.
 

 It remains to consider the fifth and sixth divisions of opiniom under this head. They are, whether the a’ct of Congress, under which the action is brought, is repugnant either to the constitution, or the ordinance “for -the government of the territory northwest of the river Ohio.”
 

 This court has already, after much deliberation, decided that the act of February 12th, 1793, was not repugnant to the constitution. The reasons, for their opipion are fully explained by Justice Story in Prigg
 
 v.
 
 Pennsylvania, 16 Peters, 611.
 

 In .coming to that conclusion they were fortified by the idea, that the constitution itself, in the clause before cited, flung its shield, for security, over such property as is in controversy in the present case, and the right to pursue and reclaim it within the limits of another State.
 

 ' This was only carrying out, in our confederate form of government, the clear right of every man at common law to make fresh suit and recapture of his own property within the realm. 3 Black. Gom. 4.
 

 But the power by national law to pursue and regain most kinds of property, in the limits of a foreign government, is rather an act of comity than strict right; and hence, as the property, in persons might not thus be recognized in some of the States in the Union, and its reck mation not be allowed through either courtesy or right, this clause was undoubtedly introduced into the constitution, as one of its compromises, for the safety bf that portion of the Union which did permit such property, and which otherwise might often be deprived of it entirely by its merely crossing the line of an adjoining State'. 3 Madison Papers, 1569, 1589.
 

 This was thought to be too harsh a doctrine in respect to any
 
 *230
 
 title to property, — of a friendly neighbour, not brought nor placed in . another State, under its laws, by the owner himself, but escaping there against his consent, and often forthwith pursued in order to be reclaimed.
 

 The act' of Congress, passed only four years after the constitution was adopted, was therefore designed merely to render' effective the guaranty of.the constitution itself; and a-course of decisions since, in the courts of the States and general government, has for half a century exhibited great uniformity in favor of the validity as well'as expediency of the act. 5 Serg. & R. 62; 9 Johns. 67; 12 Wend. 311, 507; 2 Pick. 11; Baldw. C. C. 326; 4 Wash. C. C. 326; 18 Pick. 215.
 

 While the compromises of the constitution exist, it is impossible to do justice to their requirements, or fulfil the duty incumbent on us towards all the' members of the Union, under its provisions, without sustaining such enactments as those of the statute of 1793.
 

 We do not now propose to review at length the reasoning on which this act-has been pronounced constitutional. All of its provisions have been found necessary to protect private rights, under the clause in the constitution relating to this subject, and to execute the duties imposed on the general government to aid by legislation in enforcing every constitutional provision, whether in favor of itself or others. This, grows out of the position and naturé of such a government, and is as' imperative on it in cases not enumerated specially, in respect to such legislation, as in others.
 

 That this act of Congress, then, is not repugnant to the constitution, must be considered as among the settled adjudications of this court.
 

 The last question on which a division is certified relates to the ordinance of 1787, and the supposed repugnancy to it of the act of Congress of 1793.
 

 The ordinance prohibited the existence of slavery in the territory northwest of the river Ohio among only its own people. Similar prohibitions have from time to time been introduced into many of. the old States; But this circumstance does not affect the domestic institution ■ of slavery, as other. States may choose to allow it among their people, nor impair their rights of property under it, when their slaves happen to escape to other States. These other States, whether northwest of the river'Ohio, or on the eastern side of the Alleghanies, if out of the Union, would not be bound to surrender fugitives, even for crimes, it being, as before remarked, an act of comity, or imperfect obligation.' Holmes
 
 v.
 
 Jennison et al., 14 Pet. 540. But while within the Union, and under the obligations of the constitution and laws of the Union, requiring that this kind of property in citizens of other States — the right to “ service or •labor ” — be n.ot discharged or destroyed, they must not interfere to impair or 'destroy it, but, if one so held to labor escape into
 
 *231
 
 their limits, should allow him to be retaken and returned to the place where he belongs. In all this there is no repugnance to the ordinance. Wherever that existed, States still maintain their own' laws, as well, as the ordinance, by not allowing slavery to exist among'their own citizens (4 Martin’s R. 385). But in relation, to inhabitants of' other States, if they escape into the limits of States within the ordinance, and if the constitution allow them, when fugitives from labor, to be reclaimed, this does not interfere with their own laws as to. their own-people, nor do acts of Congress interfere-with them, which are rightfully passed to carry these' constitutional rights into effect there, as folly as in other portions of the Union.
 

 . Before concluding, it may be expected by the defendant that( some notice .should he taken of the argument, urging on us a disregard of the constitution and the act of Congress in respect to this subject, on account of. the supposed inexpediency and invalidity of all laws recognizing slavery or any right of property in man. But that is a political question, settled by each State for itself; and the federal power over it is limited and regulated by the people of the States in the constitution itself, as one of its sacred compromises, and which we possess no authority as a judicial body to modify or overrule.
 

 Whatever may be the theoretical opinions of any as to the expe-. diency of some of those compromises, or of the right of property in persons which they recognize, this court has no alternative, while they exist, but to stand by the constitution and laws with fidelity to their duties and their oaths. Their path'is a strait and narrow one, to go where that constitution and the laws lead,' and not to break both, by travelling without or beyond them.
 

 Let our opinion on the several points raised be certified to the. Circuit Court of Ohio in conformity to these views.
 

 Order.
 

 This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Ohio, and on the points and questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion, agreeably to the act of Congress in such case made and provided, and "was argued by counsel; on consideration whereof, it is the opinion of this court, —
 

 1st. That, under the fourth section of the act of 12th February, 1793, respecting fugitives from justice, and persons escaping from the service of their master, on a charge for harbouring and concealing fugitives from labor, the notice need not be in writing by the claimant or his% agent, stating that such person is a fugitive front labor, under the third section of the above act, and served on the person harbouring or concealing such fugitive, to make him liable to the penalty of five hundred dollars under the act.
 

 
 *232
 
 2d. That such notice, if not in writing and served as aforesaid, may be given verbally by :the claimant or. his agent, to the person who harbours or conceals the fugitive, and that to charge him under the statute, a general notice to the public in a newspaper is not necessary.
 

 3d. That clear proof of the knowledge of the defendant, by his own confession or otherwise, that he knew the colored person w.as a slavé and fugitive from labor, though he may havé acquired such knowledge from the slave himself, or otherwise, is sufficient to charge him with notice.
 

 4th. That receiving the fugitive from labor at three o’clock ih the morning, at a place in the State of Ohio, about twelve miles distant from the place in Kentucky where the fugitive was held to labor, from a certain individual, and transporting him in a closely covered wagon twelve or fourteen miles, so that the boy thereby escaped pursuit, and his services were thereby lost to hjs master, is a har-bouring or concealing of the fugitive within the statute.
 

 ■ 5th. That a transportation under, thé above circumstances, though the boy should be recaptured by his master, is a harbouring or concealing of him within the statute.
 

 6th.' That such a transportation, in - such a wagon, whereby the ■ services of the boy were entirely lost to his master, is a harbouring of him within the statute.
 

 7th. That a claim of the fugitive from the person hárbouring or concealing him need not precede or accompany the notice.
 

 8th. That any overt act, so marked in its character as to show an intention to elude the vigilance, of the master or his agent, and which is calculated to,attain such an object, is a h.'irbouring of the fugitive within the statute. .
 

 9th. That the first and second counts contain .the necessary, averments, that Andrew, the colored man, escaped from the State of Kentucky into the State of Ohio.
 

 10th. That said counts contain-the necessary averments of notice that said Andrew was a fugitive from labor within, the description of the act of Congress.
 

 11th. That the averments in said counts, that the defendant harboured said Andrew, are sufficient.
 

 12th. That said counts are otherwise sufficient.
 

 13th. That the act of Congress approved February 12th, 1793, is not repugnant to the constitution of the United States. And, '
 

 Lastly. That the said" act is not repugnant to the ordinance of Congress adopted July, 1787, endtled, “An ordinance for the government of the territory'of the United States northwest of the river Ohio.”'
 

 It is thereupon now here, ordered and adjudged by this court,, that it be so' certified to the" said Circuit Court of the United States for the District of Ohio.