In the

# United States Court of Appeals
### For the Seventh Circuit

No. 11-2917

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEANNA L. COSTELLO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:09-cr-30072-WDS-1—**William D. Stiehl**, *Judge*.

ARGUED DECEMBER 14, 2011—DECIDED JANUARY 31, 2012

Before POSNER, MANION, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*.   The defendant was charged with violating 8 U.S.C. § 1324(a)(1)(A)(iii), which provides that anyone who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors or shields from detection [or attempts to do any of these things], such alien in any place, including any building or any means of transportation," is punish-

able by a maximum prison term of 5 years and a maximum fine of $250,000. 8 U.S.C. § 1324(a)(1)(B)(ii); 18 U.S.C. § 3571(b)(3). The parties agreed to a bench trial on stipulated facts. The district judge found the defendant guilty and sentenced her to two years' probation and to pay a $200 fine.

The stipulated facts are sparse. The defendant is an American citizen who at the time of the alleged offense lived in a small Illinois town about five miles from St. Louis, named Cahokia. She had a romantic relationship with a Mexican whom she knew to be an illegal alien. He lived with her in Cahokia for about a year, which ended in July 2003 when he was arrested on a federal drug charge. He pleaded guilty, spent several years in prison, and upon completion of his sentence was removed to Mexico. He returned to the United States without authorization, and one day in March 2006 (we don't know how long that was after he'd returned to the United States), the defendant picked him up at the Greyhound bus terminal in St. Louis and drove him to her home in Cahokia, the same home in which they had lived together during his previous sojourn in this country. He lived there more or less continuously until his arrest in October 2006 on drug charges. He was prosecuted, and convicted both of marijuana offenses (conspiracy to distribute marijuana and possession with intent to distribute it), and of having returned to the United States illegally after having been removed, and was given a stiff prison sentence.

The defendant in this case was indicted for all three offenses specified in section 1324(a)(1)(A)(iii)—concealing,

harboring, and shielding from detection an alien known to be in this country illegally. The judge determined, ostensibly on the basis of the stipulated facts, which were the entire record except for the transcript of a phone call (see below), that "her actions were designed, at least in part, to facilitate and conceal [the boyfriend's] return to the United States as an illegal alien, and to harbor him in this country and, therefore, that she acted knowingly . . . . [Her] actions, . . . including picking the alien up at the Greyhound station, giving him shelter, and coming to his aide [*sic*] after he was arrested, amount to 'substantial assistance' because she made his illegal presence in the United States easier, and facilitated his avoidance of detection."

There is no evidence that the defendant concealed her boyfriend or shielded him from detection, and the focus of the briefs and argument on appeal has therefore been on the harboring offense. The judge's reference to the defendant's "coming to [the boyfriend's] aid" is to the boyfriend's having called the defendant from his car as he was being chased by federal agents and her having responded by driving to the site of the arrest. There is nothing in the stipulated facts, or in the phone conversation, which was recorded and transcribed, to support the judge's characterization of her response. The boyfriend had not asked her for help, nor did she say anything to suggest she was coming to his aid. So far as appears, she was merely worried and anxious and preferred to see what had happened to her boyfriend rather than remain at home sitting on her hands. There is no indication of what if anything she did when she arrived at the scene.

The district judge seems to have thought that the defendant's having driven the boyfriend from the bus terminal to her home was significant. But the distance was so short—about six miles—that in a pinch he could have walked. And had he wanted to take public transportation he could have used the St. Louis metro transit system; the price of his ticket would have been $2.75. (That is the price today; it probably was lower in 2006.) There is nothing to suggest that the two of them had prearranged the pickup, or that, had she not picked him up, he would have returned to Mexico. (We don't know how long he had been in the United States.) She was not charged with the offense in the next subsection of section 1324(a)(1)(A) of "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." § 1324(a)(1)(A)(iv).

All that's left is "harboring," which if defined broadly enough describes her action in having permitted the boyfriend to live with her. The government argues that "to harbor" just means to house a person, a meaning that it claims to derive from dictionaries that were in print in 1952 or today; surprisingly the government omits dictionaries that were current in 1917, when concealing and harboring aliens were added to the prohibition of smuggling aliens into this country. Immigration Act of February 5, 1917, Pub. L. No. 64-301, ch. 29, § 8, 39 Stat. 874, 880 (repealed). In the Immigration and Nationality Act of June 27, 1952, Pub. L. No. 82-411, Title IV, § 274(a), 66 Stat. 163, 228-29, Congress added penalties for the concealing and harboring offenses, in response to

a Supreme Court decision, *United States v. Evans*, 333 U.S. 483 (1948), that had held that the 1917 Act had somehow failed to specify penalties for those offenses.

The actual definition of "to harbor" that the government has found in these dictionaries and urges us to adopt is "to shelter," which is not synonymous with "to provide a place to stay." "To shelter" has an aura of protectiveness, as in taking "shelter" from a storm. To shelter is to provide a refuge. "Sheltering" doesn't seem the right word for letting your boyfriend live with you. We have not scoured dictionaries current in 1917 or 1952, but note for what it's worth that the 1910 edition of *Black's Law Dictionary* defines "to harbor" as: "To receive clandestinely and without lawful authority a person for the purpose of so concealing him that another having a right to the lawful custody of such person shall be deprived of the same. A distinction has been taken, in some decisions, between 'harbor' and 'conceal.' A person may be convicted of harboring a slave, although he may not have concealed her." Henry Campbell Black, *A Law Dictionary* 561 (2d ed. 1910) (citations omitted).

So the government's reliance on the dictionary definition of "harboring" is mistaken, though a point of greater general importance is that dictionaries must be used as sources of statutory meaning only with great caution. "Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the

dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (L. Hand, J.). "[T]he choice among meanings [of words in statutes] must have a footing more solid than a dictionary—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures." Frank H. Easterbrook, "Text, History, and Structure in Statutory Interpretation," 17 *Harv. J.L. & Public Policy* 61, 67 (1994); see also A. Raymond Randolph, "Dictionaries, Plain Meaning, and Context in Statutory Interpretation," 17 *Harv. J.L. & Public Policy* 71, 72 (1994). "[I]t makes no sense to declare a unitary meaning that 'the dictionary' assigns to a term. There are a wide variety of dictionaries from which to choose, and all of them usually provide several entries for each word. The selection of a particular dictionary and a particular definition is not obvious and must be defended on some other grounds of suitability. This fact is particularly troubling for those who seek to use dictionaries to determine ordinary meaning. If multiple definitions are available, which one best fits the way an ordinary person would interpret the term?" Note, "Looking It Up: Dictionaries and Statutory Interpretation," 107 *Harv. L. Rev.* 1437, 1445 (1994) (footnote omitted).

Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings. *In re Erickson*, 815 F.2d 1090, 1092 (7th Cir. 1987). A sign in a park that says "Keep off the grass" is not properly inter-

preted to forbid the grounds crew to cut the grass. "[O]ne can properly attribute to legislators the reasonable minimum intention 'to say what one would ordinarily be understood as saying, given the circumstances in which it is said.' This principle, it should be noted, does not direct interpreters to follow the literal or dictionary meaning of a word or phrase. To the contrary, it demands careful attention to the nuances and specialized connotations that speakers of the relevant language attach to particular words and phrases in the context in which they are being used." John F. Manning, "The Eleventh Amendment and the Reading of Precise Constitutional Texts," 113 *Yale L.J.* 1663, 1704 (2004). We doubt that the government would argue that a hospital emergency room that takes in a desperately ill person whom the hospital staff knows to be an illegal alien would be guilty of harboring, although it fits the government's definition of the word.

A Google search (conducted on December 13, 2011, rather than in 1952 or 1917, but the government implies by its reliance on current dictionaries that the word means the same today as on the date of the statute's enactment, an implication consistent with *Black's Law Dictionary*) of several terms in which the word "harboring" appears—a search based on the supposition that the number of hits per term is a rough index of the frequency of its use—reveals the following:

"harboring fugitives": 50,800 hits
"harboring enemies": 4,730 hits

"harboring refugees": 4,820 hits
"harboring victims": 114 hits
"harboring flood victims": 0 hits
"harboring victims of disasters": 0 hits
"harboring victims of persecution": 0 hits
"harboring guests": 184 hits
"harboring friends": 256 hits (but some involve
     harboring Quakers—"Friends," viewed in
     colonial New England as dangerous heretics)
"harboring Quakers": 3,870 hits
"harboring Jews": 19,100 hits

It is apparent from these results that "harboring," as the word is actually used, has a connotation—which "sheltering," and *a fortiori* "giving a person a place to stay"—does not, of deliberately safeguarding members of a specified group from the authorities, whether through concealment, movement to a safe location, or physical protection. This connotation enables one to see that the emergency staff at the hospital may not be "harboring" an alien when it renders emergency treatment even if he stays in the emergency room overnight, that giving a lift to a gas station to an alien with a flat tire may not be harboring, that driving an alien to the local office of the Department of Homeland Security to apply for an adjustment of status to that of lawful resident may not be harboring, that inviting an alien for a "one night stand" may not be attempted harboring, that placing an illegal alien in a school may not be harboring (cf. *Plyler v. Doe*, 457 U.S. 202 (1982)), and finally that allowing your boyfriend to live with you

may not be harboring, even if you know he shouldn't be in the United States.

The prohibition of concealing, shielding from detection, and harboring known illegal aliens grew out of the prohibition of smuggling aliens into the United States. Immigration Act of 1907, Pub. L. No. 59-96, 34 Stat. 898. Concealing illegal aliens in the United States and shielding them from detection in the United States are closely related to smuggling; they are active efforts to keep illegal aliens in the United States. We needn't assume that harboring is redundant; it can be given a meaning that plugs a possible loophole left open by merely forbidding concealing and shielding from detection. Suppose the owner of a Chinese restaurant in New York's or San Francisco's Chinatown employs known illegal aliens as cooks, waiters, and busboys because they are cheap labor, and provides them with housing in order to make the employment, poorly paid though it is, more attractive, and also because they lack documentation that other landlords would require of would-be renters. The owner is harboring these illegal aliens in the sense of taking strong measures to keep them here. Yet there may be no effort at concealment or shielding from detection, simply because the immigration authorities, having very limited investigative resources, may have no interest in rooting out illegal aliens in Chinese restaurants in Chinatowns. It is nonetheless harboring in an appropriate sense because the illegal status of the alien is inseparable from the decision to provide housing—it is a decision to provide a refuge for an illegal alien *because* he's an illegal alien.

The defendant in the present case was not trying to encourage or protect or secrete illegal aliens. There is no suggestion that she prefers illegal aliens as boyfriends to legal aliens or citizens. She had a boyfriend who happened to be (as she knew) an illegal alien, and he lived with her for a time. Had she been aware of section 1324 and fearful of prosecution and hence had told him to move out of her house, he could have found some other place to live in Cahokia, or elsewhere.

It's not as if he was made safer from the feds by living with her. On the contrary, the stipulation of facts—which remember is the only source of the facts upon which she was convicted—states that the boyfriend "had lived with the defendant at 816 LaSalle St. in Cahokia, Illinois, for approximately a year before his arrest in July of 2003 on a federal drug charge. [He] disclosed his cohabitation with the defendant *at this address to federal authorities during a proffer on October 31, 2003*. . . . In March 2006, the defendant picked [the boyfriend] up from a Greyhound Bus Station in St. Louis, Missouri, and transported him to her home *at 816 LaSalle St. in Cahokia, Illinois*" (emphasis added). The stipulation goes on to state that on several occasions while he was living with the defendant after his return to the United States he moved out and stayed with his uncle or his brother, who lived elsewhere in Illinois and whose addresses, as far as we know, were unknown to the authorities. So, had he been living with one of them rather than with her because she refused to take him back when he returned to the United States, he might well have been safer.

We don't even know whether he derived any economic advantage from living with the defendant—for all we know, they shared expenses and his share exceeded what it would have cost him to rent a room somewhere else. The government and perhaps the district judge assumed that she, or her house, was what enabled him to remain in or return to the United States, but there is no evidence of that and it cannot be assumed.

The restaurant owner in our example provides an inducement to illegal aliens. There is no evidence that the defendant provided an inducement to her boyfriend to remain in or return to the United States. (As we said, she was not charged with inducement.) On the scanty record on which her conviction was based, it is as likely that it was the drug trade that drew and kept him in the United States as it was the girlfriend.

To call this harboring would carry section 1324 far beyond smuggling, and a considerable distance as well from concealing and from shielding from detection. That considerable distance identifies a further problem with the use of dictionaries to determine statutory meaning. Legislative prohibitions are often stated in strings of closely related and overlapping terms, to plug loopholes. They do not have identical dictionary definitions (if they did, the use of multiple terms would have no point), but the overlap means that in many applications they will be redundant, so that to pick out of the dictionary, for each statutory term, a definition remote from that of the other terms may be to misunderstand why the legislature included

multiple overlapping terms. We have warned that "the fact that a clause is broadly worded to stop up loopholes doesn't justify a literal interpretation that carries far beyond any purpose that can reasonably be imputed to the drafter. 'When a statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of its being applied to situations absurdly remote from the concerns of the statute's framers.'" *Abbott Laboratories v. Takeda Pharmaceutical Co.*, 476 F.3d 421, 426 (7th Cir. 2007), quoting *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997).

The way in which adjacent terms shed light on each other's meaning, *United States v. Williams*, 553 U.S. 285, 294-95 (2008)—a light not to be found in a dictionary—is illustrated by *Begay v. United States*, 553 U.S. 137 (2008), where the Supreme Court interpreted a statute that defined as a "violent felony" an act or series of acts that is "burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The Court held that driving under the influence of alcohol, although a dangerous activity, was not within the scope of the subsection's residual clause ("or otherwise involves conduct that presents a serious potential risk of physical injury to another") because it lacked the essential character of the enumerated crimes, all of which involved "purposeful, violent, and aggressive" conduct. 553 U.S. at 144-45.

The string of prohibitions in section 1324(a)(1)(A)(iii) is most naturally understood as the following series of

loophole-stopping near synonyms: "concealing" is concealing; "shielding from detection" usually is concealing but could involve bribing law enforcement authorities—in other words paying someone else to conceal (yet the shade of difference is tiny—no surprise in a string of near synonyms); and the office left to "harboring" is, then, materially to assist an alien to remain illegally in the United States without publicly advertising his presence but without needing or bothering to conceal it, as in our restaurant example—though harboring *could* involve advertising, for instance if a church publicly offered sanctuary for illegal aliens and committed to resist any effort by the authorities to enter the church's premises to arrest them.

But to make "harboring" sweep so far beyond concealing or shielding from detection as to reach the examples we gave earlier of what we think the word does *not* mean in section 1324 would yield a prohibition that couldn't be understood as just plugging possible loopholes in the first two prohibitions. It would go well beyond the bans on concealing and shielding from detection, and indeed would reach further than any other term in section 1324, which forbids bringing someone one knows to be an illegal alien into the country, § 1324(a)(1)(A)(i), transporting a known illegal alien "in furtherance of such violation of law," § 1324(a)(1)(A)(ii), and "encourag[ing] or induc[ing]" an alien to enter the country illegally. § 1324(a)(1)(A)(iv).

The number of illegal aliens in the United States was estimated at 10.8 million in 2010. Michael Hoefer, Nancy

Rytina & Bryan C. Baker, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2010," p. 1 (Office of Immigration Statistics, U.S. Department of Homeland Security, 2011), www.dhs.gov/ xlibrary/assets/statistics/publications/ois_ill_pe_2010.pdf (visited Dec. 20, 2011). No doubt thousands, perhaps many thousands, of persons are involved in concealing, shielding from detection, or harboring—under unexceptionable understandings of these terms—aliens whom they know to be illegal. The government's lawyer conceded at oral argument that under the government's broader definition of harboring the number of violators of section 1324(a)(1)(A)(iii) might well be two million. Did Congress intend such a leap when it added harboring to the list of offenses in that subsection? Illegal aliens were a smaller fraction of the American population then. But still—is it likely that Congress intended that parents whose child invites an immigrant classmate who, as they know, is illegally in the country to a sleepover might be branded as criminals even if he didn't accept the invitation, since the statute criminalizes attempts?

And notice, among the paradoxes with which the government's position is rife, that although generally it is not a crime to be an illegal alien (though there are important exceptions, as when the alien has eluded examination or inspection by immigration officers, 8 U.S.C. § 1325(a), or, as in the case of the defendant's boyfriend, has returned to the United States without authorization after having been removed, § 1326(a)), an illegal alien becomes a criminal by having a wife, also an illegal alien, living with him in the United States; if they have

children, born abroad and hence illegal aliens also, living with them, then each parent has several counts of criminal harboring, on the government's interpretation of the statute. The effect would be a profound change in the legal status of aliens in the United States.

The Justice Department does little to publicize the existence of federal criminal prohibitions, numerous as they are—there are more than 4000 separate federal crimes, as well as countless regulations the violation of which is criminal. There are too few prosecutions for violations of section 1324(a)(1)(A)(iii) to have created widespread public awareness of the law, let alone of its outer reach as conceived by the government. We asked the Department of Justice for statistics, and it informs us that, according to its records (which it tells us may be incomplete), in fiscal year 2011 only 223 cases were filed that included a count under section 1324(a)(1)(A)(iii). We have found a Justice Department press release concerning a prosecution for harboring illegal aliens, but it charges behavior remote from that of the defendant in the present case: "Columbia County Couple Indicted for Harboring Illegal Aliens for Commercial Advantage and Laundering the Proceeds of that Crime," www.fbi.gov/atlanta/press-releases/2011/columbia-county-couple-indicted-for-harboring-illegal-aliens-for-commercial-advantage-and-laundering-the-proceeds-of-that-crime (visited Dec. 20, 2011).

Courts like to say that knowledge of the law is presumed. But what they mean is that ignorance of the law, though common, is not a defense to a criminal prosecu-

tion. There are good practical reasons for this rule, but it results in many injustices, since ignorance of specific legal prohibitions is widespread. The prevalence of such injustices argues for trying to conform criminal prohibitions, by judicial interpretation where that is a permissible option, to prevalent usages. We mustn't forget the rule of lenity in the interpretation of criminal statutes, e.g., *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.), or the words of the great nineteenth-century English jurist of criminal law James Fitzjames Stephen: "Before an act can be treated as a crime, it ought . . . to be of such nature that it is worth while to prevent it at the risk of inflicting great damage, direct and indirect, upon those who commit it." *Liberty, Equality, Fraternity* 151 (1992 ed. [1873]).

The government tells us not to worry: we judges can rely on prosecutors to avoid bringing cases at the outer margin of the government's sweeping definition of "harboring." But this case *is* at the outer margin. No doubt it was brought because the Justice Department suspects that the defendant was involved in her boyfriend's drug dealings, but cannot prove it, so the Department reaches into its deep arsenal (the 4000-plus federal crimes) and finds a crime that she doubtless never heard of that it can pin on her. She was sentenced only to probation and to pay a fine but now has a felony record that will dog her for the rest of her life if she loses this appeal.

We've assumed thus far that we have to find a meaning for harboring that will distinguish it sharply

from concealing and from shielding from detection. Indulging that assumption may be too generous to the government. Statutory redundancy is common, and also common as we've said is for a statute to string together words of prohibition that are almost synonyms, the better to plug potential loopholes.

Remember that the words "concealing" and "harboring" were added to the smuggling statute in the 1917 act. There is no statutory definition but here is how one court interpreted them: "When taken in connection with the purposes of the act, we conceive the natural meaning of the word 'harbor' to be to clandestinely shelter, succor, and protect improperly admitted aliens, and that the word 'conceal' should be taken in the simple sense of shielding from observation and preventing discovery of such alien persons." *Susnjar v. United States*, 27 F.2d 223, 224 (6th Cir. 1928). So concealment ("*clandestinely* shelter") is an element of harboring. In like vein *United States v. Mack*, 112 F.2d 290, 291 (2d Cir. 1940), an opinion by Learned Hand, states that "the statute is very plainly directed against those who abet evaders of the law against unlawful entry, as the collocation of 'conceal' and 'harbor' shows. Indeed, the word, 'harbor' alone often connotes surreptitious concealment."

A similar statute, entitled "Concealing Person from Arrest," punishes "whoever harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after

notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person." 18 U.S.C. § 1071. In *United States v. Foy*, 416 F.2d 940, 941 (7th Cir. 1969), we defined to "harbor" in that statute as "to lodge, to care for after secreting the offender." To "harbor" appears in still another federal criminal statute, 18 U.S.C. § 1381, which prohibits harboring military deserters, and there the word has been interpreted to mean providing lodging and care "after secreting the deserter." *Michael v. United States*, 393 F.2d 22, 34 (10th Cir. 1968); *Firpo v. United States*, 261 F. 850, 853 (2d Cir. 1919). See also *Jones v. Van Zandt*, 46 U.S. (5 How.) 215, 232 (1847) (Fugitive Slave Act).

If as the *Susnjar* and *Mack* opinions suggest, concealment is inherent in harboring, this may seem to make the statutory prohibition of harboring redundant, and that will bother anyone who doubts that statutes ever contain redundancies (is there such an anyone?)—redundant because if harboring always involves concealing, why not just prohibit concealing? But think back to the restaurant example. The owner does not house his illegal employees in order to conceal them, though that is one effect. He is reducing their interactions with citizens, who might report them to the authorities. It is a perfect case of harboring, but might be a weak case of concealing, if the defendant could convince the jury that concealment was not his purpose in housing them.

The government doesn't rest its case entirely on dictionaries. It directs us to judicial opinions such as *United States v. Acosta de Evans*, 531 F.2d 428 (9th Cir. 1976),

where we read that "harbor" means "both concealment and simple sheltering, although the latter appears to be the primary meaning." *Id.* at 430. Because the only choice the court could see was between concealing and simple sheltering (meaning "letting another stay at one's house," though as we've noted that's not the same as "sheltering," which, like "harboring," connotes protection against some external menace), and the former was already in the statute, and because the court did not consider the possibility of statutory redundancy and thought mistakenly that "simple sheltering" is the primary meaning of "harboring," it was driven to conclude that harboring must mean simple sheltering. The analysis is unpersuasive, but in any event *Acosta de Evans* is distinguishable from the present case. In that case the defendant had met the illegal alien, her cousin Imelda, in Mexico, and Imelda had complained about the difficulty of legal immigration. Imelda got in touch with the defendant and went to live with her upon arriving illegally in the United States. These facts implied a plan between the two for Imelda to enter illegally and live with the defendant, and there is no evidence of inducement of illegal entry in the present case.

In all but one of the other appellate cases we've found the defendant did other things for the illegal alien besides providing a place to stay, such as employing him or helping him to obtain false documentation to conceal his illegal status. See, e.g., *United States v. Zheng*, 306 F.3d 1080, 1086 (11th Cir. 2002); *United States v.*

*Batjargal*, 302 Fed. App'x 188, 191 (4th Cir. 2008) (per curiam). So when opinions define harboring as simple sheltering, as they sometimes do, *United States v. Kim*, 193 F.3d 567, 573-74 (2d Cir. 1999); *United States v. Jimenez*, 391 Fed. App'x 818 (11th Cir. 2010) (per curiam); *United States v. Balderas*, 91 Fed. App'x 354 (5th Cir. 2004) (per curiam), we cannot tell whether they would do so if confronted by the facts of our case, in which the defendant did nothing more than cohabit with a boy-friend who happened to be (as she knew) an illegal immigrant. We must not forget Holmes's aphorism, suggestive though overstated, that "general propositions do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905) (dissenting opinion). A general proposition will often as a matter of semantics cover facts remote from those of the case in which the proposition is stated, yet the court that stated it might qualify or refine it when confronted with significantly different facts.

Rather than contenting themselves with "simple sheltering" or its synonyms as definitions of harboring, some courts struggle for a definition that will avoid the anomalies that we've discussed at such length in this opinion. See, e.g., *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008); *United States v. Lopez*, 521 F.2d 437, 441 (2d Cir. 1975). The Ninth Circuit itself, in a case decided long after *Acosta de Evans*, approved a jury instruction that to convict for harboring required proof that the defendant had acted with the purpose of preventing detection of the illegal alien. *United States v. You*, 382 F.3d 958, 966 (9th Cir. 2004). Some cases, in order to refine the definition of "harboring," adopt the formula "substan-

tial facilitation of" or "substantially to facilitate" the alien's presence, *United States v. Ozcelik*, 527 F.3d 88, 99 (3d Cir. 2008); *United States v. Tipton*, *supra*, 518 F.3d at 595, which strikes us as too vague to be a proper gloss on a criminal statute. *United States v. Ye*, 588 F.3d 411, 416 (7th Cir. 2009). Finally, in the only case we've found in which the government prosecuted, for harboring, someone who had merely cohabited with a known illegal alien, *United States v. Silveus*, 542 F.3d 993, 1003-04 (3d Cir. 2008), the government conceded that cohabitation, without more, is not harboring, and the court reversed the defendant's harboring conviction.

A better gloss than "substantial facilitation" would be providing (or offering—for remember that the statute punishes the attempt as well as the completed act) a known illegal alien a secure haven, a refuge, a place to stay in which the authorities are unlikely to be seeking him—and thus a definition of "harboring" that differentiates it from "simple sheltering" in the sense of just providing a place to stay or just cohabiting, although as we said that is not what sheltering actually means.

Our rejection of equating harboring to providing a place to stay compels the acquittal of the defendant, for on our understanding of the offense no trier of fact could reasonably find that the defendant had "harbored" her boyfriend based on the stipulated facts, or that she had concealed him or shielded him from detection.

REVERSED WITH INSTRUCTIONS.

MANION, *Circuit Judge*, dissenting.    The defendant Deanna L. Costello was convicted of "harboring" an illegal alien under 8 § U.S.C. 1324(a)(1)(A)(iii). Costello appealed, arguing that the facts were insufficient to support a conviction under the statute. In this appeal, the court rejects the ordinary definition of the term "harboring" and asserts that the facts cannot support Costello's conviction even when considering a more exacting definition of "harboring"; thus, the court would reverse Costello's conviction. I disagree, and conclude that the plain language of the statute and the stipulated facts support the conviction of harboring. Accordingly, I respectfully dissent.

It is important to recognize the facts of this particular case; we do not need to speculate with hypotheticals. Costello is a legal American resident. When her boyfriend first moved in with her in 2002, he was merely an alien who had entered the United States without being legally admitted. If he had been caught in his undocumented condition by the Department of Homeland Security, charging Costello with harboring, a felony, at that time arguably may have been an unjust application of the law. But that did not happen. Her boyfriend then committed drug crimes, was arrested and convicted of a federal felony, and imprisoned for several years. Following his imprisonment, he was formally deported from the United States, only to reenter the country shortly thereafter in violation of his status and order of deportation. He reunited with Costello when she picked him up at the bus station and then allowed him to live with her in her home for about seven months. His stay

with Costello ended after he and his brother crashed when being chased by Drug Enforcement Administration ("DEA") agents. During the chase he contacted Costello, but was taken into custody after the crash.

So Costello was not simply a person who was letting her boyfriend live with her. That may have been the case early in the relationship when all she knew was that he was "a Mexican whom she knew to be an illegal alien." (Opinion, p.2.) But any naivete (more likely deliberate ignorance) ceased when her boyfriend was arrested, convicted, imprisoned for a federal drug crime, and then deported. When Costello brought her boyfriend back to her home the second time, she was well aware that he was a convicted felon who had been deported after several years in federal prison, and who had further violated the law by reentering the United States without authorization in violation of his deportation proceedings.[1] What's more, this is not a situation where Costello let her boyfriend stay at her place temporarily; instead, for approximately seven months, she provided him with a place to reside until another altercation with law enforcement ended with his arrest. This is not a case at the "outer margin." (Opinion, p.16.)

The court appears to find Costello's conviction unfair and worthy of reversal because there are so many potential "harboring" violations that presumably

---

[1] The stipulation of facts does not indicate whether Costello knew her boyfriend's reentry was a felony in violation of 8 U.S.C. § 1326(a).

occur throughout the United States but are not prose-
cuted. But that is not a reason for us to invalidate a fed-
eral law that Congress expects the Department of Justice
to enforce. Prosecution is not always necessary
and proper. "If a person commits a relatively nominal
act that is proscribed by § 1324(a)(1)(A)(iii), the
executive branch has the discretion to forego prosecu-
tion." *United States v. Xiang Hui Ye*, 588 F.3d 411, 416
(7th Cir. 2009). When interpreting a statute, courts
should not overlay the statute with a "veneer" that
"appropriates that discretion and also invades the
province of Congress." *Id.* The court's decision
both invades congressional province and impermissibly
questions the executive's decision to prosecute.

Courts should interpret the statute according to its
"plain language," and "assume[] that the purpose of
the statute is communicated by the ordinary meaning
of the words Congress used." *Id.* at 414-15 (quoting and
citing *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir.
2008)). In this case, the statute declares that any
person who "conceals, harbors, or shields from detec-
tion" an illegal alien is criminally liable. 8 U.S.C.
§ 1324(a)(1)(A)(iii). Contrary to the court's assertion,
the ordinary meaning of "harboring" certainly includes
"providing shelter to." This was a common under-
standing of the term when the term "harbor" was first
added to the statute in 1917, and when the statute was

amended and the term retained in 1952.[2] As we noted in *Ye*, "'conceal,' 'harbor,' and 'shield from detection' have independent meanings, and thus a conviction can result from committing (or attempting to commit) any one of the three acts." *Ye*, 588 F.3d at 414. Perhaps if Costello had shooed her boyfriend out the back door when the police were approaching from the front, she could be accused of shielding. Or if she had hidden him in the basement under a pile of laundry when federal agents showed up with a search warrant, she could also be charged with concealing. But she neither shielded nor concealed; instead, she provided shelter to her boyfriend, and nothing more is required to charge her with harboring under the statute.

The court suggests a more exacting definition of "harboring" than "providing shelter to," namely, "providing . . . a known illegal alien a secure haven, a refuge, a place to stay in which the authorities are unlikely to be seeking him." (Opinion, p.21.) Certainly Costello qualifies under this more narrow definition. Her home was a refuge and a safe haven because it was protected by the privacy the Fourth Amendment provides her—freedom from unreasonable searches. By allowing her boyfriend to stay with her, it made it

---

[2] See Webster's New International Dictionary of the English Language 981 (1917) ("harbor" defined as "[t]o afford lodging to; to entertain as a guest; to shelter; to receive; to give refuge to"); Webster's New Collegiate Dictionary 376 (John P. Bethel et al., eds. 1953) ("harbor" defined as "to entertain as a guest; to shelter; to give a refuge to").

much less likely for the authorities to discover that he had reentered the country.[3] Until his criminal conduct exposed him to the police, he lived in a haven secure from any governmental scrutiny. This refuge lasted for approximately seven months until the time her boyfriend was captured with drugs after running from his wrecked car following a high-speed chase.

Under the facts of this case, the charge and conviction for harboring was by no means an overreach. Costello acted not just with the knowledge that her boyfriend was a mere illegal alien, but also with the knowledge that he was a convicted felon who had been deported and had reentered the country in violation of his deportation order. And she did not give him just a short-term place to stay; instead, for seven months, she provided him with a safe place to live. What Costello did—providing her boyfriend with shelter and a safe

---

[3] The court asserts that because the government authorities knew that Costello's boyfriend had previously lived at Costello's house before his first arrest in July 2003, he was not "made safer" by living there on his return to the United States. But until Costello's boyfriend connected with his brother in the drug trade and got caught by the DEA, the authorities apparently did not know that he had reentered the country; so they had no reason to suspect that he was staying at Costello's house. Costello's home still provided him with a private safe harbor, free from public interference and out of the eyes of the authorities. Obviously the occasions when he stayed with his brother were by no means in a safer haven.

place to stay—was exactly what Congress intended to prohibit under the statute.[4] I am in agreement with the district court's conclusion. Costello was knowingly guilty of harboring under 8 § U.S.C. 1324(a)(1)(A)(iii), and she was properly charged and convicted. Therefore I respectfully dissent.

---

[4] It is important to note that Costello only received probation while her boyfriend got a stiff sentence for drug conspiracy and illegal reentry. It is likely that most of those potentially liable for harboring aliens with records similar to Costello's boyfriend are beneficiaries of or participate in a criminal enterprise—otherwise they don't get caught—and so are charged and convicted of other, more serious offenses. Costello's only offense was harboring an illegal alien who entered and remained in the United States in violation of law; but she knowingly committed that crime and it is not unfair that she receive the felony stain that comes with her conviction.