**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 29, 2013
Decided June 7, 2013

**Before**

WILLIAM J. BAUER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

| | |
|---|---|
| No. 12-2359 | |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 11-CR-183-JPS |
| KEITH REITER, *Defendant-Appellant*. | J.P. Stadtmueller, *Judge*. |

**O R D E R**

Following a jury trial, Keith Reiter was convicted of defrauding the Social Security Administration by concealing an event that had made him ineligible to continue receiving supplemental security income. *See* 42 U.S.C. § 1383a(a)(3). The event alleged in the indictment was his receipt of over $180,000 upon the death of his mother. Reiter argues that the evidence presented at his trial was insufficient to support a guilty verdict, but his argument depends on misdirection and a tortured reading of § 1383a(a)(3). Because the jury was presented with ample evidence of Reiter's guilt, we affirm the judgment of the district court.

Keith Reiter began receiving supplemental security income in 1993 after he developed a disabling mood disorder. The SSI program is based on need and is not available to anyone whose financial resources, excluding certain property, exceed $2,000. 20 CFR § 416.1205. Reiter acquired over $180,000 when his mother, Joyce, died in October 2003. The money was in a Wells Fargo investment account that Joyce had set up to pass to Reiter automatically upon her death. Joyce's remaining property was in probate until December 2004, at which point Reiter received an additional $39,340.

Reiter was asked in early 2004 to come in to the Social Security field office in Sheboygan, Wisconsin, for a reevaluation of his eligibility for benefits. The reason was that he had moved from California to Wisconsin before Joyce's death, and SSI payments vary based on where the beneficiary resides. Reiter visited the field office that April and completed a "Statement for Determining Continuing Eligibility for Supplemental Security Income Payments." That document includes a section on financial resources where he listed $4 in cash, a Wells Fargo checking account containing $300, and his car (which does not count toward the $2,000 cap, *see* 42 U.S.C. § 1382b(a)(2)(A)). According to the SSA employee who interviewed him, Reiter mentioned something about his brother, with whom he was living, possibly inheriting money from their mother. But Reiter did not list or mention his ownership of the $180,000 investment account, though he was actively involved with managing it and had made three deposits to the account earlier that day. Instead, he wrote on the form, "I do not own any other type of resource." He signed his name directly below a warning that lying constitutes a crime.

About five months after this meeting Reiter received what appears to be a follow-up letter from the Social Security field office requesting documentation of his contribution to his brother's household expenses. The letter goes on to say: "Also, you have never answered our questions about the settlement of your mother's estate. We need to know how much you received and when you received it." Although Joyce's estate was settled that December, the SSA never received a response to the letter and, for whatever reason, did not pursue the issue. But the agency did send letters to Reiter (both before and after his reevaluation) to remind him of the $2,000 cap on resources and his obligation to report any resources beyond that threshold. Yet when Reiter's eligibility for benefits was reevaluated again in 2005, he filled out another "Statement for Determining Continuing Eligibility" and listed as resources only a small amount of cash and a few hundred dollars in a checking account.

Reiter's SSI payments continued until 2009, when the IRS alerted the SSA to the existence of the Wells Fargo investment account. Reiter had accepted about $44,000 in payments since becoming ineligible for SSI almost six years earlier.

At trial, Reiter (a reasonably sophisticated defendant with an advanced degree) testified to having a vague recollection of calling the SSA shortly after his mother's death to disclose that he had acquired the $180,000 investment account. He could offer no corroboration of such a call (beyond a calendar on which he had written the SSA's toll-free number). Reiter also testified that, although he knew about the $2,000 limit on resources, he believed he was enrolled in PASS, a tightly administered SSI program that helps enrollees to create a plan for getting off SSI. A PASS plan can include putting aside resources in excess of $2,000 to pay for specific self-improvement endeavors, such as college. *See* Plan To Achieve Self Support (PASS), http://www.socialsecurity.gov/disabilityresearch/wi/pass.htm (visited Jan. 16, 2013). Reiter was never enrolled in PASS, and there is no evidence that he ever submitted an application.

At the close of the evidence, the jury received instructions that repeat the indictment's allegations: Reiter had acquired a $180,000 investment account upon his mother's death, but he "concealed and failed to disclose" this event until October 2009. The instructions also faithfully laid out the elements of SSI fraud: The defendant, (1) while receiving SSI benefits, (2) "concealed, or failed to disclose the occurrence of an event affecting his right to receive such benefit" (3) "with an intent to fraudulently secure the benefit when no such benefit was authorized."

After the jury found him guilty, Reiter moved for acquittal. *See* FED. R. CRIM. P. 29. He argued that the 2004 letter from the agency asking about his mother's estate is proof that he disclosed the event affecting his SSI eligibility, namely "that he would be receiving financial assets on account of his mother's death." His motion was denied because he had never disclosed his receipt of the $180,000 account. He was sentenced to six months' imprisonment and three years' supervised release.

On appeal Reiter revives the argument he made in his motion for acquittal. He points out that SSI fraud is committed when a beneficiary "conceals or fails to disclose" the "occurrence of any *event* affecting . . . his continued right to any such benefit," 42 U.S.C. § 1383a(a)(3) (emphasis added), and he argues that the evidence presented at trial was insufficient to prove that he failed to disclose such an event. Once again he insists that the 2004 agency letter requesting information about Joyce's estate is proof that he reported the relevant event, which he now describes as "the fact that he received an inheritance from his mother." Reiter reasons that § 1383a(a)(3) requires disclosure of the "existence of the event" but not the "details of the event (i.e. the amount of the inheritance)" or "a complete itemization of all information surrounding the event." The only authority he cites is *United States v. Costello*, 666 F.3d 1040, 1050 (7th Cir. 2012), a case about what it means to "harbor" an undocumented alien. His theory is that § 1383a(a)(3), like the statute in *Costello*, has been stretched in this case to cover conduct that Congress never intended to criminalize. The

"ordinary meaning" of "event," he says, encompasses only the information he purportedly revealed to the SSA (that his mother had left him money). Essentially, he is arguing that an SSI recipient can comply with the duty to disclose an "event affecting" SSI eligibility by intentionally designating the event in a way that conceals the very reason it affects eligibility.

Such an interpretation of § 1383a(a)(3) would undermine the provision's effectiveness and encourage chicanery, and the legislative history contains no suggestion that Congress intended to shield people who behave like Reiter from prosecution. *See* H.R. Rep. No. 92-231 (1972). Additionally, few could read the "event affecting" language of § 1383a(a)(3), which is also found in numerous other federal fraud statutes, *see, e.g.*, 42 U.S.C. §§ 408(a)(4); 1320a-7b(a)(3); 290cc-32(a)(2), and fail to understand that a person cannot disclose such an event without disclosing the feature of it that affects eligibility. In this case, the amount of money Reiter received was essential information; had Reiter's mother left him only $1000, for example, it would not have been an event affecting his eligibility for continued SSI payments. Finally, § 1383a(a)(3) specifies that the defendant must have acted "with an intent fraudulently to secure [SSI payments]." *Id.* § 1383a(a)(3). This intent element "cures any ambiguity in the statutory description of the proscribed conduct." *United States v. Huckaby*, 698 F.2d 915, 920 (8th Cir. 1982) (rejecting a vagueness challenge to the "event affecting" language of the statute prohibiting Medicaid fraud).

The evidence here was enough to persuade a rational jury that Reiter intentionally concealed his acquisition of an investment account containing over $180,000 and that he did so to obtain benefits he wasn't entitled to receive. Viewing the evidence in the light most favorable to the government, *see United States v. Wasson*, 679 F.3d 938, 949 (7th Cir. 2012), the jury's verdict is unassailable: Reiter had no explanation for lying about his resources on his statements for determining SSI eligibility, the jury was free to discredit his testimony about calling the SSA to disclose the $180,000 investment account, and the 2004 letter from the SSA field office asking about his mother's estate is not evidence that he disclosed his acquisition of the account.

AFFIRMED.